JAMES GIULIETTI ET AL. *v.* JOHN L.
GIULIETTI ET AL.
(AC 20391)

VERNON VILLAGE, INC. *v.* JOHN L. GIULIETTI ET AL.
(AC 20392)

JOHN J. GIULIETTI ET AL. *v.* JOHN L.
GIULIETTI ET AL.
(AC 20393)

JAMES GIULIETTI *v.* VERNON VILLAGE, INC., ET AL.
(AC 20394)

Lavery, C. J., and Mihalakos and Peters, Js.

814

Argued May 3—officially released October 2, 2001

*John L. Giulietti,* pro se, the appellant (defendant in each case), with whom, on the brief, was *Noah H. Starkey.*

*Michael J. Kopsick,* for the appellees (plaintiffs in the first, second and fourth cases).

*Robert J. Cary, Jr.,* with whom, on the brief, was *John T. Asselin,* for the appellees (plaintiffs in the third case).

Opinion

LAVERY, C. J. John L. Giulietti, the defendant in each of four cases that were consolidated for trial, appeals from the judgments rendered against him and in favor of the various plaintiffs. This intrafamily litigation revolves around the defendant's allegedly improper effectuation of a plan to transfer ownership of a family's assets from the parents to their four adult children. The parties are a husband and wife, John J. Giulietti (Mr. Giulietti)[1] and Alma L. Giulietti (Alma); their four children, John L. Giulietti (attorney Giulietti), the defendant attorney whose actions are central to these appeals, and his siblings, James Giulietti (James), Anita Giulietti (Anita) and Joanne F. Hollis (Joanne); and Vernon Village, Inc., the private corporation that the family formed to run its mobile home park business. That corporation and the property at 325 Kelly Road in Vernon, on which the mobile home park is situated, comprise the property the distribution of which is implicated in these appeals.

---

[1] Mr. Giulietti died between the time of trial and the rendering of the trial court's judgments. James Giulietti, his executor, was substituted in Mr. Giulietti's place as a defendant in appeal AC 20392 and as a plaintiff in appeal AC 20393.

The four actions briefly may be described as follows. Appeal AC 20393 is from the judgment in a fraud and legal malpractice action that was brought by Mr. Giulietti and Alma against their son, attorney Giulietti,[2] in which they alleged that the latter failed to effectuate the property distribution as Mr. Giulietti had directed. Appeal AC 20391 is from the judgment in a partition action, brought by James and Joanne against their brother, attorney Giulietti,[3] to secure an order for the partition and private sale of 325 Kelly Road. Appeal AC 20394 is from the judgment in a corporate dissolution action, brought by James against attorney Giulietti and Vernon Village, Inc., to dissolve the corporation due to management deadlock resulting from the family discord. Appeal AC 20392 is from the judgment in a usurpation of corporate opportunity action, brought by Vernon Village, Inc., against Mr. Giulietti[4] and attorney Giulietti, for their allegedly improper purchase of real property adjacent to 325 Kelly Road.

The trial court rendered judgments against attorney Giulietti in the fraud and legal malpractice action, and in the usurpation of corporate opportunity action. The court disposed of the partition action by ordering 325 Kelly Road partitioned and sold, and the court found the corporate dissolution action moot in light of the relief it had ordered in the other actions.[5] Attorney

---

[2] James, Joanne, Anita and Vernon Village, Inc., also were named as defendants.

[3] Anita and Vernon Village, Inc., also were named as defendants.

[4] Mr. Giulietti was added as a defendant at attorney Giulietti's behest.

[5] Because the court ordered the reformation of the corporate ownership of Vernon Village, Inc., as part of its relief in the malpractice action, the corporate deadlock alleged in the dissolution action ceased to exist. The court therefore denied the relief sought in the first count of the dissolution action and rendered judgment for the defendants, Vernon Village, Inc., and attorney Giulietti, on that count. The court also denied attorney Giulietti's request to exercise an election to purchase the corporate shares. The court, however, awarded the plaintiff attorney's fees on the second count of his complaint, which had been added by amendment, because he had prevailed in defending against attorney Giulietti's counterclaim seeking the plaintiff's removal as a corporate officer.

Giulietti now appeals from each of those judgments. His claims on appeal are as follows.

In appeal AC 20393, attorney Giulietti appeals from the judgment of the court concluding that he committed fraud and legal malpractice against his parents in his oversight of the family property distribution. He claims that the court improperly (1) failed to conclude that the legal malpractice and fraud claims were barred by the applicable statute of limitations, (2) concluded that an attorney-client relationship existed between him and Alma, (3) concluded that he committed fraud against Alma, (4) concluded that he committed fraud generally in respect to the property transfers and (5) enjoined him from filing notices with financial institutions pursuant to his petitions in the Vernon Probate Court for the appointment of conservators over his parents' estates.

In AC 20391, attorney Giulietti appeals from the court's judgment ordering the partition and private sale of 325 Kelly Road, and the imposition of a constructive trust in favor of his sisters on a portion of his fractional share. He claims that the court improperly (1) ordered a private sale rather than a public sale, and (2) imposed the constructive trust because there was insufficient evidence to justify the imposition of such a trust and procedural irregularities existed.

In AC 20394, attorney Giulietti appeals from the court's judgment that the corporate dissolution action was moot and the court's ruling that even if the action were not moot, he would be barred from electing to purchase James' shares of Vernon Village, Inc. He claims that the court improperly interpreted and applied General Statutes § 33-900 so as to find the dissolution action moot and to disallow his election to purchase his brother's stock in Vernon Village, Inc.

In AC 20392, attorney Giulietti appeals from the court's judgment that he and Mr. Giulietti usurped a

corporate opportunity of Vernon Village, Inc. He claims on appeal that the court improperly (1) allowed the action to proceed because it was not authorized by the company's board of directors, (2) found that the chance to purchase land adjacent to 325 Kelly Road constituted a corporate opportunity, (3) imposed a constructive trust on the subject property in favor of Vernon Village, Inc., and (4) removed him from the position of corporate director of Vernon Village, Inc.

We will address each of those claims, in the order presented, after setting forth the facts and procedural history relevant to the various issues. The record reveals the following facts and trial court holdings.

The Giulietti family business since 1959 was the ownership and management of Vernon Village, a mobile home park in Vernon. Mr. Giulietti and Alma owned all of the stock of Vernon Village, Inc., incorporated in 1966 to manage the park's business, and Mr. Giulietti held title to 325 Kelly Road, the site of the park. Vernon Village, Inc., operated the park under a series of informal month-to-month leases with Mr. Giulietti. Mr. Giulietti and James managed the day-to-day activities of the business. Attorney Giulietti graduated from law school in 1972 and, after about seven years of private practice, accepted Mr. Giulietti's offer to devote his efforts full-time to handling legal matters for the family and for its business. The two sons served as corporate officers of Vernon Village, Inc., since the early 1980s, James as president and attorney Giulietti as secretary. Joanne and Anita, during the times at issue in these appeals, lived out of state and did not participate substantially in the operation of Vernon Village, Inc., although Joanne at times served on its board of directors.

As Mr. Giulietti aged, he decided to begin transferring ownership of the family assets to his four children. He

envisioned that his sons would continue to earn salaries by running the mobile home park and that otherwise the family assets would be shared by the children equally. In 1983 and 1984, Mr. Giulietti deeded to the four siblings, in equal portions, two additional pieces of real property that he owned in Vernon and South Windsor. Attorney Giulietti prepared the deeds to effectuate those transfers.

In late 1990, Mr. Giulietti and James met with the family's accountant, Bernard Blum, to discuss estate planning issues and to determine the best way to transfer the remaining family property from parents to children. Blum suggested a gradual transfer of 325 Kelly Road, a portion each year, so as to avoid incurring gift taxes. Mr. Giulietti directed attorney Giulietti to proceed with the transfer accordingly. Mr. Giulietti's directions were general, as he trusted his son to deal with the details.

Attorney Giulietti prepared a first deed, which transferred from Mr. Giulietti to the four children an unspecified fractional interest in 325 Kelly Road. He also drafted an antialienation agreement that barred conveyance or encumbrance of 325 Kelly Road by any of its owners without the unanimous consent of the others, and required that any inter-owner buyout would be at a price well below fair market value. He entitled that document simply "Agreement." By its terms, it would remain in effect until 2011 or until Mr. Giulietti's death, whichever occurred later. Attorney Giulietti also prepared a document entitled "Terms of Escrow" (hereinafter first escrow) that named attorney William G. Reveley as escrow agent. The first escrow provided that the first deed would be held, unrecorded, by Reveley until all four siblings signed the antialienation agreement. In late December, 1990, attorney Giulietti advised Mr. Giulietti to execute the deed and the first

escrow. The same day, attorney Giulietti and James signed the antialienation agreement.

A few months later, the 325 Kelly Road property was appraised at $410,000. That value was conservative, taking into account the fact that the property was, in effect, subject to a long-term lease.[6] On the basis of that value and the family's tax planning objectives, attorney Giulietti filled in the percentage conveyed by Mr. Giulietti to each child by the first deed as "4 7/8 percent."

On June 21, 1991, Joanne and Anita, not wanting to sign the antialienation agreement drafted by attorney Giulietti, sent their brothers a written counterproposal. Their proposed agreement would terminate with their father's death and would give each sibling a buyout right at the fair market value as determined by another appraisal to be performed after January 1, 1996. Attorney Giulietti rejected his sisters' counterproposal without consulting his father, although he told Anita and Joanne that Mr. Giulietti had rejected it.

On December 31, 1991, and December 31, 1992, respectively, attorney Giulietti prepared and Mr. Giulietti signed second and third deeds, each of which conveyed another 4 7/8 percent of 325 Kelly Road to each of the four siblings. On each of those dates, Mr. Giulietti signed documents prepared by attorney Giulietti entitled "Supplemental Terms of Escrow Agreement." Those documents imposed the same condition on the second and third gifts of property as did the first escrow on the first gift, i.e., the signing of the antialienation agreement by the recipients. At that point, neither Anita nor Joanne had signed the antialien-

---

[6] Although the lease between Vernon Village, Inc., and the Giuliettis was oral, the appraiser considered it to be enforceable for purposes of the appraisal. The same appraiser testified at trial that the "real" fair market value of the property was $2,900,000.

ation agreement and the portions of the 325 Kelly Road property deeded to the siblings remained in escrow.

On March 11, 1993, and April 30, 1993, respectively, Anita and Joanne signed the antialienation agreement. They signed the agreement only because they believed that it was a condition imposed by their father, not their brother, with which they had to comply to receive their shares of 325 Kelly Road. On May 28, 1993, pursuant to attorney Giulietti's direction, Reveley released the first three deeds from escrow and recorded them on the Vernon land records.

On December 31, 1993, attorney Giulietti drafted and Mr. Giulietti executed four separate deeds, transferring another 4 7/8 percent of 325 Kelly Road to each child. Attorney Giulietti also drafted and had his father sign a second escrow agreement (second escrow), to which he, Mr. Giulietti and attorney Frank J. McCoy, Jr., also were parties. The second escrow included a condition requiring attorney Giulietti's siblings to sign additional documents related to Rockledge, LLC, a limited liability company that attorney Giulietti planned to form for developing and selling other property owned by the siblings at 990 Hartford Turnpike in Vernon[7] before they could receive the shares conveyed by the December 31, 1993 deeds. The second escrow further provided that if a sibling refused to sign those additional documents by February 28, 1994, McCoy would destroy the deed conveying an interest to that sibling, but that attor-

---

[7] Mr. Giulietti had deeded the property at 990 Hartford Turnpike in Vernon to his children in 1984. The siblings previously had formed a partnership, Rockledge Estates, to develop the property into a mobile home park. They then agreed to transfer twenty of the thirty-six lots thereon to a limited liability company, in which Vernon Village, Inc., would have a percentage ownership, in exchange for investment funds. They further agreed that the four would own the remainder of the limited liability company in equal shares and that each would receive individual title to four of the remaining sixteen lots at 990 Hartford Turnpike.

ney Giulietti could choose to extend the deadline to March 30, 1994, if he so desired.

On May 13, 1994, attorney Giulietti and James, each having signed all of the documents contemplated by the second escrow, formed Rockledge, LLC. The sisters, however, did not sign the Rockledge, LLC, documents. Consequently, only the December 31, 1993 deeds conveying additional portions of 325 Kelly Road to the brothers were released from escrow, while those to their sisters remained in escrow. Thereafter, the brothers, as a result of their greater percentage ownership of 325 Kelly Road, began to receive correspondingly greater shares of the rental payments from the mobile home park business.[8]

On June 16, 1994, attorney Giulietti had Mr. Giulietti execute an amendment of and reinstatement of the December 31, 1993 escrow agreement (third escrow), which required that a second entity, "Dot, LLC," be formed to manage the 325 Kelly Road property. The Dot, LLC, operating agreement, drafted by attorney Giulietti, required the siblings to transfer their current and future interests in 325 Kelly Road to Dot, LLC, extended the nonalienability of the land to December 31, 2025, and created a management structure that excluded Anita, and allowed any two of the other three siblings to control the business of Dot, LLC.[9] The third escrow also

---

[8] The brothers, each owning 19.5 percent of 325 Kelly Road, received rental payments of $9360 from Vernon Village, Inc., while the sisters, each owning 14.625 percent, received payments of only $7020.

[9] Section 7.1 of the Dot, LLC, operating agreement required each of its members, i.e., the siblings, to transfer their interests in 325 Kelly Road to the entity as an initial capital contribution. It provided further that if a member failed to do so, profits and distributions would be withheld from that member, and he or she would bear the costs of litigation brought to enforce the agreement.

Section 5.2 of the agreement provided for three managers, named as attorney Giulietti, James and Joanne. Section 5.1 gave managers the "full and complete authority, power and discretion to manage and control the businesses, complete authority, power and discretion to manage and control the business, affairs and properties of the LLC, to make all decisions regard-

required each sibling to sign the still unexecuted documents from the second escrow to have his or her 1993 deed released and recorded, and, therefore, to receive equal interests in 325 Kelly Road and equal rental receipts therefrom. Attorney Giulietti told his sisters that his father required them to sign all of those documents as a condition for receiving any future gifts. Meanwhile, he told his father that his sisters were being difficult and still refused to sign "the Agreement."

On June 22, 1994, attorney Giulietti and James formed Dot, LLC, signing the required documents. Joanne and Anita still had not signed the Rockledge, LLC, documents and did not sign the Dot, LLC, documents. Attorney Giulietti drafted a letter to his sisters, signed by him and James, stating that "Father is instructing Attorney McCoy that there will be no more extensions of time of this escrow agreement and is further instructing Attorney McCoy to destroy his daughters' two individual deeds if his daughters do not sign *in proper form* the documents presented to Anita during her visit [here] this week. Those documents include both Dot LLC and Rockledge Drive LLC." (Emphasis in original.)

On July 19, 1994, attorney Giulietti prepared, and had Mr. Giulietti execute, another deed that granted a 9 3/4 percent interest in 325 Kelly Road only to the two brothers. Shortly thereafter, the December 31, 1993 and July 19, 1994 deeds granting portions of the property to attorney Giulietti and James were recorded on the

---

ing those matters and to perform any and all other acts or activities customary or incidental to the management of the LLC's business." It provided further that "[a]t any time when there is more than one Manager, any two Managers may exercise all of the powers delegated to the Managers herein and may take any action permitted to be taken by the Managers."

Section 5.3 (d) of the agreement required that "[t]he land at 325 Kelly Road at which the mobile home park is located must be held in the name of the LLC until December 31, 2025." It allowed that "[a]fter December 31, 2025, this provision may be changed by the affirmative vote or written consent of the Members holding at least two-thirds of all Company Interest."

Vernon land records. On July 26, 1996, Joanne signed all of the documents as directed by the third escrow; however, attorney Giulietti never directed that the deeds to her be released from escrow and recorded.

Thereafter, attorney Giulietti advised Joanne that their father wanted to convey his remaining interest in the 325 Kelly Road property. Attorney Giulietti wrote Joanne a letter suggesting that she decline accepting a portion of Anita's share, and let James and attorney Giulietti take it instead.[10] On August 1, 1994, attorney Giulietti prepared and had Mr. Giulietti execute a final warrantee deed, transferring the remaining interest in 325 Kelly Road to James and attorney Giulietti only. The deed was immediately recorded. Attorney Giulietti also had Mr. Giulietti sign an "Authorization for Destruction of Deeds, Continued Retention of Dot LLC Documents, and Recordation of Final Deed." Until December, 1994, however, attorney Giulietti continued telling Joanne and Anita that they would receive 25 percent interests in Dot, LLC, and 325 Kelly Road only if the requisite documents were signed by Anita.

On December 19, 1994, attorney Giulietti, purportedly acting on his father's behalf, reduced the annual rental payments from Vernon Village, Inc., to the landowners from $48,000 to $2735, to force his sisters into compliance. He drafted a letter to his sisters for his father to sign, explaining the reason for the rent reduction.[11]

---

[10] The letter stated in relevant part: "However, we thought that we should contact you and ask you first before the 28.453% deed was prepared. In the military when a sergeant is reduced in rank from sergeant to private (commonly called 'busted') some other corporal or private is promoted to sergeant; in military vernacular this is called promotion a 'blood stripe.' Some people would decline these promotions for a variety of reasons."

[11] The letter stated in relevant part: "I want you, Anita, to sign *all* the papers concerning 'Dot LLC' . . . . Until *all* those papers are signed by Anita, I am reducing the rent that Vernon Village Inc pays you two and your two brothers . . . . I am directing Johnny and Jim to mail each of you checks for [$200] which [cover] the rental period for 325 Kelly Road from July 31 to December 31, 1994." (Emphasis in original.)

Thereafter, attorney Giulietti prepared a letter for Mr. Giulietti's signature directing McCoy to destroy the deeds still in escrow for the sisters. The end result of all the various deeds recorded was that attorney Giulietti owned 35.375 percent of 325 Kelly Road, James owned 35.375 percent, Joanne owned 14.625 percent and Anita owned 14.625 percent.

After the land transfer was complete, attorney Giulietti undertook transfers of his parents' stock in Vernon Village, Inc. Of the ten shares of the corporation, Mr. Giulietti owned six and Alma four. Because Alma trusted James and not attorney Giulietti, attorney Giulietti enlisted James' help to convince her to transfer her stock to the two brothers. Attorney Giulietti similarly convinced Mr. Giulietti[12] and then structured the gift as a sale by drafting four promissory notes payable to the parents, signed by the brothers, for a total purchase price of $100,000.[13]

Attorney Giulietti drafted the stock transfer documents, and, in a casual and informal manner, the brothers had their parents sign them one evening amidst the clearing of the dinner dishes. Attorney Giulietti did not ever advise Mr. Giulietti and Alma that he, as a recipient of half the stock, had a conflict of interest in acting as attorney on the transfer. The four promissory notes had no default or acceleration provisions, were interest free and made no provision for the payee's collection of attorney's fees in the event of a default.[14]

---

[12] The court found that Mr. Giulietti was surprised when attorney Giulietti approached him about transferring the business because he believed that it already had been transferred along with the real property of 325 Kelly Road.

[13] The court found that attorney Giulietti did not have the stock appraised and that he picked the $100,000 value arbitrarily.

[14] Attorney Giulietti structured the transaction as a sale rather than a gift so as to avoid gift taxes on the transfer. Although he subsequently made payments on the notes, he did so by giving himself a raise in an amount similar to the payments due.

On February 6, 1995, attorney Giulietti advised his sisters as to the new ownership of the stock. Because of their control of Vernon Village, Inc., the brothers now could dictate the amount of rental payments their sisters received. The sisters from that point forward received less rent than their brothers. Furthermore, the brothers' ownership of Vernon Village, Inc., indirectly gave them larger interests in Rockledge, LLC.[15] As a result, as the Rockledge lots were sold, the sisters received less from the proceeds than did the brothers.

James had been compliant about signing all of the various documents put before him between 1991 and 1996, perhaps believing that attorney Giulietti eventually would arrange for an equal distribution of the family assets. By 1997, however, the brothers' relationship had soured, and James told attorney Giulietti that he would not sign any more documents. In April, 1998, James, in his capacity as president of Vernon Village, Inc., terminated attorney Giulietti's employment with the company.

On March 25, 1998, attorney Giulietti filed a conservatorship petition with the Probate Court in Vernon, alleging that Alma was not competent to manage her assets. The Probate Court did not find her to be incompetent and, consequently, rejected the petition.

On April 23, 1998, Mr. Giulietti, angered by his son's filing of the conservatorship petition and his failure to effectuate the property distribution as directed, sent a letter to James and attorney Giulietti expressing his anger and directing that they adjust the property interests so that their sisters would share equally.[16] The

---

[15] Vernon Village, Inc., owned 32 percent of Rockledge, LLC.

[16] The letter stated in relevant part: "It has come to my attention that the land known as 325 Kelly Road was not given to my four children by me equally, as was my intention and understanding. It has also come to my attention that the company stock of Vernon Village Inc. [that] I owned was not 'sold' equally to my four children as I wished and understood. Since my understanding of the current situation reveals to me that my intentions were

brothers did not comply. The filing of the family's various legal actions soon followed.

Mr. Giulietti and Alma filed an action against attorney Giulietti, alleging fraud, malpractice and breach of contract concerning the various transfers. Attorney Giulietti filed an action seeking an injunction reinstating his employment with Vernon Village, Inc.[17] James initiated a corporate dissolution action for Vernon Village, Inc. James and Joanne commenced an action seeking to partition the 325 Kelly Road property and to reform the interests of the four siblings so as to vest in each a 25 percent interest in the property. Vernon Village, Inc., filed an action against attorney Giulietti and Mr. Giulietti alleging breach of fiduciary duty, specifically, the usurpation of a corporate opportunity. The various actions were assigned to the complex litigation docket and consolidated for trial, which was held in August and September, 1999.

Attorney Giulietti's position at the trial and on appeal is that his father understood and intended the import of the various documents that attorney Giulietti drafted for his signature. He claims that his father and his sisters were aware that the gifting plan would result in unequal ownership of the family property if the sisters would not comply with the terms of the escrows and that they all consented to that distribution. Attorney Giulietti argues that all of the previously discussed transactions were executed with the complete knowledge of his family members because he informed them fully of each step that he undertook.

---

not executed, I feel misrepresented and mislead [sic]. Therefore, I now demand to both of you that you convey the part of your interest in the land at 325 Kelly Road to your two sisters, so there is equal land ownership among my four children. I also demand that you sell part of your stock interest in Vernon Village, Inc. to each of your sisters at the same favorable terms and price I gave to the both of you."

[17] Attorney Giulietti was successful in having his employment reinstated. Therefore, the injunction action is not a subject of the present appeal.

Attorney Giulietti claims that he cannot be held to any wrongdoing because both his father and his sisters, at various times, received independent legal advice. Further, he insists, had the sisters signed the requisite documents, the end result would have been equal ownership of Dot, LLC, by the siblings. Attorney Giulietti argues, essentially, that he was carrying out his father's wishes in structuring the transfers as he did and that his sisters, by refusing to agree to the various conditions put before them, made a conscious choice to decline the opportunity for equal ownership and, instead, to accept lesser interests in the family property.

The court found, however, that until the time he commenced the action against his son, Mr. Giulietti believed that only one "agreement" existed, that it was a four way, equal "partnership" agreement amongst the children, and that once Anita signed it, the four would own both 325 Kelly Road and Vernon Village, Inc., equally. The court found that Mr. Giulietti wished that those who actually ran the business would receive extra compensation in the form of a salary, but that he wanted his children to share equally in the ownership of the family assets and to work together to come to an agreement regarding the management of those assets.

The court noted that Mr. Giulietti in his deposition[18] had "expressed his previous trust in his son and his inability to understand why his own son did not do what he asked him to do with respect to the transfers of land and business to his children." According to the court, Mr. Giulietti, who had failing eyesight and a distaste for legal paperwork, simply trusted his attorney son and signed whatever papers were put in front of him.

---

[18] After his depositions were taken, but before the time of trial, Mr. Giulietti suffered a stroke that left him incapacitated. The parties agreed that the depositions would be admitted into evidence in lieu of his testimony.

The court found that the antialienation agreement terms were the product of attorney Giulietti's desire to keep the family business together and under his control, as it was his sole livelihood, rather than representative of his father's wishes. The court found that Mr. Giulietti never directed the drafting of or consented to the terms of the antialienation agreement, in particular the twenty year bar on selling one's share except to a sibling at a price far below fair market value.

Further, the court found that the second and third escrows, requiring the signing of the Rockledge, LLC, and Dot, LLC, documents, were imposed unilaterally by attorney Giulietti, not at the behest of Mr. Giulietti, and that the latter "had no understanding of the terms, purposes or complexities of these documents." It also found that attorney Giulietti had used the mechanism of separate, rather than aggregate, deeds for the 1993 land transfer so as to "facilitate destruction of a deed to a noncompliant sibling." The court found that Mr. Giulietti had not given instructions to McCoy to destroy the deeds to Mr. Giulietti's daughters if they did not sign the paperwork. It further found that even after Joanne had signed all that she had been asked to sign, attorney Giulietti withheld the release and recording of her deeds as leverage to pressure her to persuade Anita to sign the various documents that were contemplated by the escrows. The court found that the December, 1994 rental decrease was attorney Giulietti's idea, not Mr. Giulietti's, and that attorney Giulietti had misrepresented to his sisters the reasons therefor.

The court found that Mr. Giulietti had agreed to transfer the stock to only his sons because he believed attorney Giulietti's representations that the daughters were being uncooperative and because he believed that once Anita signed the "Agreement," the children's property interests would become equalized. The court found that neither sister had known that the stock would be trans-

ferred as it was and that neither would have signed any of the prior documents had they known that their brothers were to assume control of the corporation.

The court found that attorney Giulietti, in filing for a conservatorship for Alma, was attempting to gain control over his mother's assets because he realized that intrafamily litigation was imminent and wanted to prevent his mother from funding the family's legal representation.

The court concluded that the evidence clearly and convincingly showed that attorney Giulietti had committed legal malpractice and fraud on his parents and, therefore, it reformed the various property interests of the siblings so as to effectuate Mr. Giulietti's true intent, that is, each sibling now owns 25 percent of 325 Kelly Road and 25 percent of the stock of Vernon Village, Inc. Further, the court voided the antialienation agreement, finding that it was procured by fraud, and ordered that 325 Kelly Road be sold at a private auction wherein the only permitted bidders will be the four siblings. The court also ordered that a constructive trust be imposed on attorney Giulietti's share of 325 Kelly Road for the amount of back rent owed to each of his sisters due to the improper deeding of the property. The court concluded that the corporate dissolution action was moot in that the court already had reformed the ownership of the stock in Vernon Village, Inc., in the legal malpractice action, thereby breaking the corporate deadlock that was the basis for the dissolution action. Finally, the court held that attorney Giulietti, as a corporate officer and director, had breached his common-law fiduciary and statutory duties to Vernon Village, Inc., by his purchase of real property adjacent to 325 Kelly Road, and the court ordered a constructive trust imposed on that property for the benefit of Vernon Village, Inc. Additional facts will be set forth where relevant to the issues on appeal.

## I

## THE LEGAL MALPRACTICE ACTION

### A

Attorney Giulietti first claims that the court improperly failed to find that any action against him either for legal malpractice or fraud was time barred by General Statutes § 52-577,[19] the general statute of limitations for tort actions.[20] He argues that the conduct that the plaintiffs allege as malpractice and fraud occurred between December, 1990 (the date of the first deed transferring a portion of 325 Kelly Road), and February, 1995 (the date of the stock sale and transfer), and that therefore, the action brought in September, 1998, was filed more than "three years from the date of the act or omission complained of" and therefore barred by the statute. The plaintiffs argue, however, that attorney Giulietti's actions and omissions amount to a continuing course of conduct such that the running of the statute of limitations was tolled until April 23, 1998.[21] We note that the court in its memorandum of decision did not directly address the issue of whether the plaintiffs' causes of action were time barred, though implicit in its findings of fraud and malpractice is a finding that they were not barred. We agree that those causes of action were not barred by § 52-577.[22]

---

[19] General Statutes § 52-577 provides that "[n]o action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."

[20] Attorney Giulietti also claimed error because the plaintiffs, in their reply to his special defense that the action was time barred under General Statutes § 52-577, failed to plead that the continuing course of conduct doctrine tolled the running of the statute and instead entered only a general denial. He withdrew that claim, however, in his reply brief.

[21] April 23, 1998, is the date that attorney Giulietti received the letter from his father demanding that he give his sisters 25 percent interests in Vernon Village, Inc., and 325 Kelly Road, a demand with which he failed to comply.

[22] When the trial court has not provided a memorandum of decision or a signed transcript stating its reasons for its ruling on a claim, we ordinarily will refuse to review the ruling. Here, however, in view of the complexities of the litigation and the length of time these cases have been pending, and

The question of whether a party's claim is barred by the statute of limitations is a question of law, which this court reviews de novo. See *State* v. *Coughlin*, 61 Conn. App. 90, 97, 762 A.2d 1 (2000), cert. denied, 255 Conn. 934, 767 A.2d 105 (2001). The issue, however, of whether a party engaged in a continuing course of conduct that tolled the running of the statute of limitations is a mixed question of law and fact. See *Starkweather* v. *Patel*, 34 Conn. App. 395, 401, 641 A.2d 809, cert. denied, 230 Conn. 905, 644 A.2d 918 (1994). We defer to the trial court's findings of fact unless they are clearly erroneous. *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221–22, 435 A.2d 24 (1980).

Section 52-577 applies to actions in which a plaintiff alleges legal malpractice; *Sanborn* v. *Greenwald*, 39 Conn. App. 289, 301, 664 A.2d 803, cert. denied, 235 Conn. 925, 666 A.2d 1186 (1995); and to those actions alleging fraud. See *D'Agostino* v. *D'Addio*, 6 Conn. App. 187, 188, 504 A.2d 528, cert. denied, 199 Conn. 805, 508 A.2d 32 (1986). It "is a statute of repose 'in that it sets a fixed limit after which the tortfeasor will not be held liable and in some cases will serve to bar an action before it accrues.' *Zapata* v. *Burns*, 207 Conn. 496, 508, 542 A.2d 700 (1988) . . . ." (Citation omitted.) *Sanborn* v. *Greenwald*, supra, 302.

Nonetheless, "[w]hen the wrong sued upon consists of a continuing course of conduct, the statute does not begin to run until that course of conduct is completed. *Handler* v. *Remington Arms Co.*, 144 Conn. 316, 321, 130 A.2d 793 (1957). [I]n order [t]o support a finding

because the issue has been briefed and the court provided all the facts we need to review the ruling, we will, in the interest of judicial economy, depart from our usual practices and undertake review of the court's implied rejection of the claim that the plaintiffs' causes of action were barred by the statute of limitations. See *State Library* v. *Freedom of Information Commission*, 240 Conn. 824, 833, 694 A.2d 1235 (1997). Our departure from our ordinary procedure is limited to the facts of this case.

of a continuing course of conduct that may toll the statute of limitations there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong. . . . Where [our Supreme Court has] upheld a finding that a duty continued to exist after the cessation of the act or omission relied upon, there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act. . . . *Blanchette* v. *Barrett*, [229 Conn. 256, 275, 640 A.2d 74 (1994)]. The continuing course of conduct doctrine is conspicuously fact-bound." (Internal quotation marks omitted.) *Sanborn* v. *Greenwald*, supra, 39 Conn. App. 295.

"The continuing course of conduct doctrine reflects the policy that, during an ongoing relationship, lawsuits are premature because specific tortious acts or omissions may be difficult to identify and may yet be remedied. . . . [T]he doctrine is generally applicable under circumstances where [i]t may be impossible to pinpoint the exact date of a particular negligent act or omission that caused injury or where the negligence consists of a series of acts or omissions and it is appropriate to allow the course of [action] to terminate before allowing the repose section of the statute of limitations to run . . . ." (Citation omitted; internal quotation marks omitted.) Id., 295–96.

In sum, "a precondition for the operation of the continuing course of conduct doctrine is that the defendant must have committed an initial wrong upon the plaintiff." *Sherwood* v. *Danbury Hospital*, 252 Conn. 193, 204, 746 A.2d 730 (2000). Second, "there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto.

. . . [T]hat continuing wrongful conduct may include acts of omission as well as affirmative acts of misconduct . . . ." (Citations omitted; internal quotation marks omitted.) Id., 204–205.

The facts of this case fit neatly within the contours of the continuing course of conduct doctrine such that the statute of limitations was tolled. Attorney Giulietti committed an initial wrong against his father when he prepared the first deed transferring interests in 325 Kelly Road to the siblings and had the deeds placed in escrow subject to conditions not requested by Mr. Giulietti. He committed further transgressions in drafting the subsequent deeds and escrow agreements that added further unrequested conditions. Although those actions all occurred more than three years before Mr. Giulietti and Alma filed the fraud and malpractice action against their son, there exists both a special relationship between the parties and later wrongful omissions relating back to the prior wrongful acts alleged by the plaintiffs so as to trigger the doctrine.

That is, attorney Giulietti provided legal representation and services for his family's business and Mr. Giulietti for many years; in fact, managing the family legal affairs had become his central livelihood. "[A]n attorney-client relationship imposes a fiduciary duty on the attorney . . . characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." (Citation omitted; internal quotation marks omitted.) *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 56, 717 A.2d 724 (1998). Attorney Giulietti and Mr. Giulietti, therefore, had a continuing relationship that was special beyond their familial affinity. Furthermore, attorney Giulietti's later omissions, i.e., his ongoing failure to take the steps necessary to effectuate his father's wishes regarding the property

distribution, which remained unchanged as evidenced by Mr. Giulietti's written demand to reverse the improper allocations of 325 Kelly Road and Vernon Village, Inc., related directly back to attorney Giulietti's earlier wrongs.

Because attorney Giulietti engaged in a continuing course of conduct that served to toll the running of the statute of limitations for torts, we conclude that the court, although it did not rule directly on the matter, correctly considered that the legal malpractice and fraud actions were not barred by § 52-577.

## B

Attorney Giulietti argues that the court improperly found that he engaged in fraud with respect to the transfers of Mr. Giulietti's stock in Vernon Village, Inc., and of 325 Kelly Road. He argues, essentially, that the evidence was insufficient to support a finding of fraud. We disagree.

"Fraud consists [of] deception practiced in order to induce another to part with property or surrender some legal right, and which accomplishes the end designed. . . . The elements of a fraud action are: (1) a false representation was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the other party relied on the statement to his detriment." (Internal quotation marks omitted.) *Muller* v. *Muller*, 43 Conn. App. 327, 337–38, 682 A.2d 1089 (1996). "Additionally, [t]he party asserting such a cause of action must prove the existence of the first three of [the] elements by a standard higher than the usual fair preponderance of the evidence, which higher standard we have described as clear and satisfactory or clear, precise and unequivocal." (Internal quotation marks omitted.) *Anastasia* v. *Beautiful You Hair*

*Designs, Inc.*, 61 Conn. App. 471, 477, 767 A.2d 118 (2001).

"Fraud and misrepresentation cannot be easily defined because they can be accomplished in so many different ways. They present, however, issues of fact. . . . The trier of facts is the judge of the credibility of the testimony and of the weight to be accorded it." (Internal quotation marks omitted.) Id., 478.

"In making its factual findings, [t]he trier is not limited to arbitrating the differing opinions of the witnesses but is to make determinations in the light of all the circumstances, the evidence, [and] his general knowledge . . . . [F]actual findings of a trial court . . . are reversible only if they are clearly erroneous. . . . This court cannot retry the facts or pass upon the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. Rather, we focus on the conclusion of the trial court, as well as the method by which it arrived at that conclusion, to determine whether it is legally correct and factually supported." (Citations omitted; internal quotation marks omitted.) *Muller* v. *Muller*, supra, 43 Conn. App. 338.

After our review of the record, we cannot agree with attorney Giulietti's claim that there was insufficient evidence to support the court's finding of fraud. The court heard extensive testimony from attorney Giulietti and the various family members regarding the subject transactions and Mr. Giulietti's expressions of his intent. It also considered Mr. Giulietti's deposition testimony and the overall circumstances, such as Mr. Giulietti's previ

ous equal gifts to his children, his poor eyesight, his trust in his attorney son and his hands-off approach to property divestment. Although the parties put forth contradictory versions of the events that transpired, it is clear that the court, in its role as fact finder, found attorney Giulietti's version not credible. It is not this court's function to reevaluate the credibility of witnesses whose testimony we did not hear firsthand.

Attorney Giulietti equates his father's generalized desires that the four siblings would work together to carry on the family business and that the business would remain intact while he was alive with a directive to assemble the complex scheme of deeding, escrow agreements and entity formation, and to compel the siblings to either assent thereto or forfeit their interests in family property. He argues that the "documentary evidence," that is, all of the paperwork that he created for his father's signatures, mandates a conclusion that Mr. Giulietti was aware of and gave approval for all of the various provisions within. We do not agree.

The various testimonial evidence clearly and convincingly supports the court's finding that attorney Giulietti made false representations to his father regarding the nature of the documents he drafted while knowing that those representations were untrue, and with the intent and effect of inducing Mr. Giulietti to sign off on the various transactions. The siblings testified as to Mr. Giulietti's dislike of paperwork and the legal aspects of the business, the fact that he had difficulties with his eyesight and his tendency to sign things without reading them because he trusted attorney Giulietti to effectuate his directions. They spoke of Mr. Giulietti's oft repeated desire that his children share the family property equally. Although the sisters testified that their father had asked them to sign "documents" generally, they stated that he never spoke particularly about an antialienation agreement, about Rockledge, LLC, and

Dot, LLC, or of his desire that those entities be formed as a condition of his gifting. Joanne testified that the deeds to her were not released from escrow even when she signed the required documents and related how attorney Giulietti had smirked when informing her that the siblings' property interests were not in fact equal.

The siblings were adamant that the details of the gifting scheme reflected not their father's wishes, but attorney Giulietti's. Although attorney Giulietti was equally adamant that his father had desired and authorized his every maneuver, we reiterate that "[i]t is well established that [i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . [T]he trial court is privileged to adopt whatever testimony he reasonably believes to be credible. . . . On appeal, we do not retry the facts or pass on the credibility of witnesses." (Citations omitted; internal quotation marks omitted.) *Powers* v. *Olson*, 252 Conn. 98, 105, 742 A.2d 799 (2000).

Mr. Giulietti's deposition testimony also supports the court's finding of fraud. Throughout the deposition, he repeatedly stated that he desired that the property and stock be divided evenly among his four children, and that attorney Giulietti had failed to effectuate his wishes. Mr. Giulietti also explained how he did not read the various documents put before him by attorney Giulietti and did not understand them, but signed them because he trusted his son. Mr. Giulietti's deposition testimony shows that he had little knowledge or understanding of the various documents and business entities created by attorney Giulietti. He specifically stated that he was not informed properly of the details of various transactions.

Because the court's findings have ample support in the record, we cannot say that they were clearly errone-

ous. We hold that the court's conclusion that attorney Giulietti engaged in fraud vis-a-vis his father, regarding the transfer of 325 Kelly Road and Mr. Giulietti's stock in Vernon Village, Inc., was supported by those factual findings and was legally correct.

## C

Attorney Giulietti also claims, for a variety of reasons, that the court's finding that he committed fraud against Alma was clearly erroneous. We disagree.

### 1

Attorney Giulietti first argues that the court's finding of fraud relating to the transfer of Alma's shares of Vernon Village, Inc., was clearly erroneous because when Alma testified at trial, she remarked that she was not making any claim against attorney Giulietti.

We decline to address attorney Giulietti's claim because it is inadequately briefed. Attorney Giulietti provides no authority or analysis in support of his claim, only a conclusory statement that his mother's testimony is a "striking judicial admission" that amounts to "plain error." "We are not required to review issues that have been improperly presented to this court through an inadequate brief. *Connecticut National Bank* v. *Giacomi*, 242 Conn. 17, 44–45, 699 A.2d 101 (1997). Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *In re Matthew S.*, 60 Conn. App. 127, 133, 758 A.2d 459 (2000).

"[F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. We do not reverse the judgment of a trial court on the basis of challenges to its rulings that have not been adequately briefed. . . . The parties may not

merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited. . . . [A]ssignments of error which are merely mentioned but not briefed beyond a statement of the claim will be deemed abandoned and will not be reviewed by this court. . . . Where the parties cite no law and provide no analysis of their claims, we do not review such claims." (Citations omitted; internal quotation marks omitted.) *Mullen & Mahon, Inc.* v. *Mobilmed Support Services, LLC*, 62 Conn. App. 1, 10, 773 A.2d 952 (2001).

## 2

Attorney Giulietti next claims that the court's finding of fraud relating to the transfer of Alma's shares of Vernon Village, Inc., was clearly erroneous because there was insufficient evidence that he made any representations to her regarding that transfer or that she relied on any of his representations. We disagree.

According to the testimony of both of the Giulietti brothers, Alma did not trust attorney Giulietti, but did trust James. Therefore, attorney Giulietti prepared the documentation necessary to effectuate the transfer of Alma and Mr. Giulietti's stock to the brothers and gave it to James, directing him to procure their mother's signature.[23] Attorney Giulietti argues that under those

---

[23] James testified as to the stock transactions as follows:

"Q. What did you do to facilitate your mother's signature on any of these documents pertaining to the transfer?

"A. You needed both my father's signature and my mother's signature. And I asked my mother to sign it.

"Q. Who asked that you procure your mother's signature?

"A. My brother, John L. Giulietti.

"Q. Was there actually a closing, a meeting, or a conference in which these documents were signed?

"A. No, they were signed over the kitchen table in amongst, just basically clearing away the table, and it was done very casually, like sign this; it was done very much on the fly. It was done at seven—I was there, it was done around seven, seven-thirty, late in the evening and it was not at all a big deal.

\* \* \*

"Q. What did you tell your parents, what did you, James Giulietti, tell

circumstances, he cannot be found to have committed fraud as to Alma. That claim is without merit.

Attorney Giulietti fails to consider that under settled law, he may be liable for a fraud that he commits via a third party, in this case either his brother James or his father, Mr. Giulietti.[24] "While some connection, direct or

---

your parents these documents constituted?

"A. Not much.

"Q. Did you tell them that the effect of it was [to] transfer the company over to you and your brother?

"A. Not really.

"Q. Well, what did you tell them?

"A. I said, would you please sign this.

"Q. You didn't give them any explanation.

"A. Very little, not that they . . . understood, sir.

"Q. What is very little; tell me what you mean by very little?

"A. I just said, these are some documents that we want to just straighten out the business. It wasn't really explained too well. It was late at night, they were tired—anything that I would ask them to sign—because I ask them to sign very little—they would always sign.

"Q. In fact, your mother would sign whatever you put in front of her. Is that correct?

"A. That's correct, sir.

\* \* \*

"Q. Now, who was present at the home that evening when you went over? Was it just the three of you?

"A. No, my father, my mother, and originally it was me and then my brother came in. I think my brother came by. He was really hot to get those signatures, so, I think he wanted to make sure I [had] gotten them because he asked about them three times that day, and I was kind of slow in doing it because I really didn't want to do it."

[24] The court found that attorney Giulietti "fraudulently induced his father to transfer the stock in Vernon Village, Inc., and to cause his wife to transfer her stock in Vernon Village, Inc., to himself and his brother to the exclusion of his sisters."

"The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved." 3 Restatement (Second), Torts § 533 (1977). In convincing his father to transfer his stock, attorney Giulietti, correctly, expected his mother to follow Mr. Giulietti's lead, especially if the paperwork was presented to her by James. Pursuant to the principle that liability for fraud may lie when it is

indirect, between a party charged with making false representations and a party relying thereon must be shown, it is not essential, in support of a cause of action for damages resulting from false representations, that the false representations be shown to have been made directly to the party claiming to have relied upon them. It has been repeatedly held that where a party makes false representations to another with the intent or knowledge that they be exhibited or repeated to a third party for the purpose of deceiving him, the third party, if so deceived to his injury, can maintain an action in tort against the party making the false statements . . . ." 37 Am. Jur. 2d, Fraud and Deceit § 190 (1968); see also *Gulf Oil Corp. of Pennsylvania* v. *Newton*, 130 Conn. 37, 40–41, 31 A.2d 462 (1943); 3 Restatement (Second), Torts § 534 (1977) ("[o]ne who makes a fraudulent misrepresentation intending or with reason to expect that more than one person or class of persons will be induced to rely on it . . . is subject to liability for pecuniary loss to any one such persons justifiably relying upon the misrepresentation").

Attorney Giulietti, as the architect of the plan to have his parents transfer their Vernon Village, Inc., stock to the brothers and not the sisters, cannot escape liability for fraud as to Alma because he arranged for his plan's implementation through third parties. As such, the court's finding that attorney Giulietti engaged in fraud regarding the transfer of his mother's Vernon Village, Inc., stock was proper.

### 3

Attorney Giulietti argues finally that the court's finding of fraud relating to the transfer of Alma's shares of Vernon Village, Inc., was improper because she ratified the transfer by retaining payments for those shares,

---

committed via a third party, attorney Giulietti is liable to Alma for misstatements that he made to Mr. Giulietti on which she, too, relied.

and the court did not order restitution when it voided the transfer.

Again, in making his claim, attorney Giulietti makes a bare assertion and provides no analysis or legal authority regarding ratification in the context of a fraudulently induced, intrafamily stock transfer postured as a sale for the purpose of tax avoidance. Consequently, we decline to address the claim because it has been inadequately briefed. See *Mullen & Mahon, Inc.* v. *Mobilmed Support Services, LLC*, supra, 62 Conn. App. 10; *In re Matthew S.*, supra, 60 Conn. App. 133.

D

Attorney Giulietti also claims that the court, in ruling on the plaintiffs' malpractice claim, improperly found that an attorney-client relationship existed between himself and Alma.

The court used its finding of legal malpractice as an alternate ground to support its order of relief. Because we already have upheld the court's finding that attorney Giulietti committed fraud on his parents, which induced them to transfer disproportionately 325 Kelly Road and the Vernon Village, Inc., stock, it is unnecessary for us to review the court's finding regarding legal malpractice.

E

Attorney Giulietti's final claim in the legal malpractice action is that the court improperly enjoined him from filing notices to freeze his parents' assets during his posttrial pursuit of an application in the Probate Court for the appointment of conservators over his parents' estates. He argues, essentially, that the court lacked jurisdiction to issue an order restraining activity related to a conservatorship application and that the court

abused its discretion by granting injunctive relief under the circumstances.[25] We disagree.

On September 3, 1999, after the trial concluded but before the court rendered judgment, attorney Giulietti filed with the Probate Court applications in which he sought the appointment of conservators for both of his parents' estates.[26] He also filed notices of the application, pursuant to General Statutes § 45a-653,[27] with

[25] Attorney Giulietti in his appellate brief avoids a clear explanation of what the court enjoined him from doing. His vague language suggests, inaccurately, that the restraining order barred him from pursuing the conservatorships themselves. In fact, the court ordered him only to withdraw the notices that he had filed with his parents' financial institutions and in the town records, which notices had the effect of preventing them from accessing or transferring their assets while the conservatorship applications were pending. The trial court, however, allowed the conservatorship applications to proceed in the Probate Court.

[26] General Statutes § 45a-648 (a) provides: "An application for involuntary representation may be filed by any person alleging that a respondent is incapable of managing his or her affairs or incapable of caring for himself or herself and stating the reasons for the alleged incapability. The application shall be filed in the court of probate in the district in which the respondent resides or has his domicile."

Attorney Giulietti apparently was not as concerned about his parents' ability to care for themselves as he was about their ability to manage their financial affairs. Although he applied for conservatorships over their estates, he did not apply for conservatorships over their persons.

[27] General Statutes § 45a-653 provides in relevant part: "(a) If an application for the appointment of a conservator has been made, and if, while the application is pending, the applicant records a notice of the application with the town clerk of any town within which real property of the alleged incapable person is situated and with the town clerk of the town in which the alleged incapable person resides, any conveyance of such real property by such person and any contract made by such person between the time the notice of the application is recorded and the time of the adjudication of the court upon the application shall not be valid without the approval of the court.

"(b) If, during the pendency of the application, the applicant lodges with any bank, trust company or other depositary a notice of the application, such bank, trust company or depositary shall not allow any funds of the alleged incapable person to be withdrawn, between the time the notice of the application is lodged and the time of the adjudication of the court upon the application, without the approval of the court. . . ."

financial institutions that held his parents' assets, and in the records of the towns where his parents owned real property. When the plaintiffs learned of those filings, they filed a motion with the trial court to restrain attorney Giulietti from pursuing further what they argued was an unwarranted freeze on Alma's and Mr. Giulietti's resources.

The trial court, after a hearing on September 30, 1999, found that "attorney Giulietti has not filed these conservatorship applications out of any concern for the well-being of his parents, but solely to continue his continued manipulation or attempt to manipulate all of the assets of his parents and his siblings," and it opined that "this filing is clearly an abuse and an attempt to circumvent the orders of this court to the extent that these notices filed under § 45a-653 have had the effect of tying up and preventing withdrawal or transfer of property." The court voided the notices and ordered attorney Giulietti to file releases thereof with the various financial institutions and town clerks by the following day.

Because a determination regarding a trial court's subject matter jurisdiction is a question of law, our review of attorney Giulietti's claim is plenary. See *Lawrence Brunoli, Inc.* v. *Branford*, 247 Conn. 407, 410, 722 A.2d 271 (1999). "Our Supreme Court recently set forth the governing principles for our standard of review as it pertains to a trial court's discretion to grant or deny a request for an injunction: A party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law. . . . A prayer for injunctive relief is addressed to the sound discretion of the court and the court's ruling can be reviewed only for the purpose of determining whether the decision was based on an erroneous statement of law or an abuse of discretion. . . . Therefore, unless the trial court has abused its discretion, or failed to exercise its discretion . . . the trial court's decision

must stand. . . . *Advest, Inc.* v. *Wachtel,* 235 Conn. 559, 562–63, 668 A.2d 367 (1995)." (Internal quotation marks omitted.) *Granger* v. *A. Aiudi & Sons,* 60 Conn. App. 36, 44, 758 A.2d 417, cert. denied, 255 Conn. 902, 762 A.2d 908 (2000).

Attorney Giulietti argues that the court lacked subject matter jurisdiction to issue an injunction to prevent him from filing notices freezing his parents' assets in conjunction with his conservatorship petition in the Probate Court. That claim is without merit.

"The superior court shall be the sole court of original jurisdiction for all causes of action, except such actions over which the courts of probate have original jurisdiction, as provided by statute. General Statutes § 51-164s." (Internal quotation marks omitted.) *Kinsella* v. *Jaekle,* 192 Conn. 704, 712, 475 A.2d 243 (1984). Although the courts of probate have jurisdiction over the appointment of conservators, "[a]mong the powers specifically granted to the Superior Court are the powers to issue declaratory judgments and injunctions. General Statutes §§ 52-29 (a) and 52-471 (a)." *Kinsella* v. *Jaekle,* supra, 712–13; see *Phillips* v. *Moeller,* 147 Conn. 482, 487–89, 163 A.2d 95 (1960). A "court has a duty, as well as power, to protect its jurisdiction over a controversy in order to decree complete and final justice between the parties and may issue an injunction for that purpose, restraining proceedings in other courts." (Internal quotation marks omitted.) *Corbin* v. *Corbin,* 26 Conn. Sup. 443, 450, 226 A.2d 799 (1967). The court, therefore, clearly had jurisdiction to consider and grant the restraining order sought by the plaintiffs, which was merely ancillary to the probate proceedings.

Attorney Giulietti also claims that the plaintiffs did not make the requisite showings of harm and lack of available remedy to justify injunctive relief. We disagree.

During the hearing on the restraining order, James testified as to the effect that the filing of the notices already had on his parents' ability to carry on with their personal and business activities. He testified that construction on a home that Mr. Giulietti was building was stalled when an operating account containing $60,000 to $70,000 suddenly was inaccessible. He further testified that the account in which his father's social security payments were deposited had been frozen, as was his mother's individual retirement account. James also spoke of checks written for business and legal expenses that had not been honored because of the notices filed by attorney Giulietti.[28]

The court in this case determined that attorney Giulietti, anticipating an unfavorable outcome in the cases before the court, sought conservatorships over his parents' estates not because of true concern over their abilities to manage their affairs, but to frustrate their future attempts to transfer or withdraw their assets as they desired. The court reasonably considered that the notices attorney Giulietti filed with his parents' financial institutions would remain in effect until the petitions were ruled on, causing his parents irreparable harm in light of their advanced age and immediate need for personal, business and legal funds, and possibly interfering with the court's ability to fashion a remedy in the cases before it. It likely further considered that forcing the family essentially to relitigate its disputes in the Probate Court for purposes of defeating the applications and releasing the assets was an inadequate remedy. See, e.g., *McConnell* v. *Beverly Enterprises-Connecticut, Inc.*, 209 Conn. 692, 698, 553 A.2d 596 (1989) (Probate Court may not adjudicate complex legal

---

[28] Attorney Giulietti did not personally inform his family that he was pursuing the conservatorships and that he had filed the notices. The family members became aware of his actions only when they later received the required statutory notice from the Probate Court.

questions subject to broad jurisdiction of court of equity).

Given the testimony presented at the hearing on the restraining order and the court's intimate knowledge of the Giulietti family affairs gleaned through its weeks of oversight of the complex litigation spawned by attorney Giulietti's actions, we cannot say that the court acted improperly in granting the relief that it did. As such, we hold that the court did not abuse its discretion in voiding the notices that attorney Giulietti had filed pursuant to his application for conservatorships over his parents' estates and in restraining him from pursuing further any such notices.

## II

## THE PARTITION ACTION

### A

Attorney Giulietti first argues that the court improperly ordered a private sale pursuant to the partition of 325 Kelly Road rather than a public sale. He claims that the order for a private sale, limited to the siblings, was improper because it is not authorized by General Statutes § 52-500 and because it was based on an erroneous finding of fact, that is, that all four siblings had requested a private sale. We disagree with each of those claims.

The court in its memorandum of decision, after finding that attorney Giulietti had engaged in fraud and legal malpractice vis-a-vis his parents with the end result being an uneven ownership of 325 Kelly Road, reformed the 1994 warrantee deed, which had transferred the balance of the property to only the brothers, such that the siblings' interests were equalized.[29] The

---

[29] General Statutes § 52-22 provides in relevant part that the Superior Court "in the exercise of its equitable jurisdiction may pass the title to real property by decree, without any act on the part of any party holding title to the real property, when in its judgment it is the proper mode to carry the decree into effect. . . ."

court then turned to the claims raised in the partition action brought by James and Joanne. The court first voided the antialienation agreement that attorney Giulietti had drafted with the first deed, finding that it was unfair and inequitable, that it restrained alienation for an unreasonable period of time and, most importantly, that it was procured by fraud in the inducement as to the siblings. Attorney Giulietti does not contest those findings on appeal.

The court proceeded to find that the features of 325 Kelly Road were such that a partition by sale was appropriate rather than a partition in kind.[30] Thereafter, the court ordered that the sale be a private one, restricted to the four siblings, noting that "[a]ll parties have requested [such a sale]." The court further articulated the general parameters for the ordered sale.

The court considered Mr. Giulietti's and Alma's "preference for judicial intervention" and their indication that "the return of all the land . . . to them would cause estate planning complications." It then reformed the 1994 deed so that the deed transferred 0.625 percent of 325 Kelly Road to attorney Giulietti, 0.625 percent to James, 10.375 percent to Joanne and 10.375 percent to Anita. Thus, each sibling now holds a 25 percent interest in the property as desired by Mr. Giulietti.

[30] "General Statutes § 52-495 confers an absolute right of partition upon any person holding real property as a tenant in common with others. . . . In those cases where the court finds that a sale of the property would better promote the interests of the owners, the court may order such a sale. General Statutes § 52-500 . . . This jurisdiction has long favored partition in kind, or physical division, over partition by sale. . . . Because we presume that partition in kind is in the best interests of the owners, the burden of proof rests on the party seeking a sale to demonstrate that it is the better remedy. . . . This burden may be carried by satisfying two conditions: (1) the physical attributes of the property make partition in kind impracticable or inequitable; and (2) the interests of the owners would better be promoted by partition by sale. . . . A plaintiff in an action for partition seeks to sever or dissolve involuntary joint ownership in real property. In furtherance of that objective, a court is limited to rendering a judgment of either partition in kind or by sale of the real property . . . thus terminating the ownership relationship between the parties." (Citations omitted.) *Wilcox* v. *Willard Shopping Center Associates*, 208 Conn. 318, 325–26, 544 A.2d 1207 (1988).

"The standard for reviewing the defendant's claim is whether the court abused its discretion in ordering a partition by sale. . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling." (Citation omitted.) *Geib* v. *McKinney*, 224 Conn. 219, 228–29, 617 A.2d 1377 (1992). Because statutory construction is a question of law, however, our review of a claim that a private sale was impermissible under the partition statutes is plenary. See *State* v. *Velasco*, 253 Conn. 210, 219, 751 A.2d 800 (2000).

"The process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of this case . . . . In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . In construing a statute, common sense must be used and courts must assume that a reasonable and rational result was intended." (Citation omitted; internal quotation marks omitted.) *Modern Cigarette, Inc.* v. *Orange*, 256 Conn. 105, 120, 774 A.2d 969 (2001).

Pursuant to § 52-500 (a), "[a]ny court of equitable jurisdiction may, upon the complaint of *any* person interested, order the sale of any property, real or personal, owned by two or more persons, when, in the opinion of the court, a sale will better promote the interests of the owners." (Emphasis added.) Although the case law is clear that "in resolving partition actions, the *only* two modes of relief within the power of the court are partition by division of real estate and parti-

tion by sale"; (emphasis in original) *Fernandes* v. *Rodriguez*, 255 Conn. 47, 57, 761 A.2d 1283 (2000); it is silent as to whether a court has the option of ordering either a private sale or a public sale. Therefore, whether § 52-500 grants discretion to a court to order a private sale appears to be an issue of first impression.

The language of § 52-500 itself is not helpful to a determination of whether a private sale is authorized; subsection (a) of the statute provides in relevant part only that "[a]ny court of equitable jurisdiction may, upon the complaint of any person interested, order the sale of any property . . . ." Just what types of "sales" are contemplated by the statute is not specified.

Historically, partition in kind has been the remedy of choice where owners of property do not want to be bound to each other through that ownership. Nonetheless, there exists circumstances in which physical partition is not feasible; therefore, "[i]n Connecticut, an act extending the power of our courts to order a sale in partition proceedings was enacted in 1844. Public Acts 1844, c. XIII [now § 52-500]." *Fernandes* v. *Rodriguez*, supra, 255 Conn. 56. Because of that early date of enactment, no legislative history is available.[31] "The presumption that partition in kind is in the best interests of the owners is, at least in part, founded on the premise that a sale of one's property without his consent is an extreme exercise of power warranted only in clear cases." (Internal quotation marks omitted.) Id., 56–57. The policy expressed in that presumption seems to support a court's having discretion to order a private

[31] Legislative history associated with later revisions is not substantive and sheds no light on the issue. Further, "[t]he early decisions of [courts] dealing with the new statutory remedy of partition by sale emphasized that [t]he statute giving the power of sale introduces . . . no new principle; it provides only for an emergency, when a division cannot be well made, in any other way." (Internal quotation marks omitted.) *Fernandes* v. *Rodriguez*, supra, 255 Conn. 56.

sale after determining that partition is not feasible. That is because a private sale, rather than a public sale, is closer in character to a partition in kind because it gives the current owners a better chance of retaining their property, which may have value to them beyond mere economics.

Although a judicially ordered sale generally results in a public auction, there is authority from other jurisdictions that if *either* "*authorized, or not restricted,* by statute, the court may, in the exercise of its discretion, order either a private or public sale as the best interests of the parties require, [a private sale being permitted where the court] is fully informed of the value of the property and [has] good reasons." (Emphasis added.) 50A C.J.S., Judicial Sales § 17 (1997). Section 52-500, though not specifically authorizing private sales, similarly does not specifically restrict them.

Because Connecticut common law and legislative history provide limited guidance, we turn to legislation governing the same general subject matter, that is, court-ordered sales of real property in the context of the statutes governing probate. That is appropriate given the facts in this case, which involves an intergenerational transfer of family real property near the end of the grantor's life. General Statutes § 45a-164 (a) authorizes the Probate Court, upon request of the executor of an estate, to order real property of the estate sold "if the court finds it would be for the best interests of the parties in interest to grant the application." The statute is thus similar in structure to § 52-500, which authorizes the Superior Court to make an analogous determination in response to a like request. Section 45a-164 has been applied to order the sale of real estate the character of which was such that it could not be beneficially partitioned amongst the heirs.

It is indisputable that in ordering a sale of property pursuant to § 45a-164, the Probate Court has discretion

to choose between a private sale and a public sale. General Statutes § 45a-166 (a). In light of the similarity between § 45a-164 and § 52-500 in structure and in application, particularly under the facts of this case, and in light of the policy disfavoring the forced sale of family real property, we hold that the court properly determined that it had the authority pursuant to § 52-500 to order that 325 Kelly Road be sold at a private auction rather than at a public sale.

The court was fully informed of the value of 325 Kelly Road and assigned it considerable value for purposes of the sale. Having received extensive expert testimony on the matter, the court found that the property had a fair market value of $2,900,000. Further, the court had good reasons to order the private sale, deciding that it was in the best interests of all the parties involved. It is undisputed that at least three of the four siblings desired such a sale. Additionally, the court considered that "[t]he Giulietti family wishes to continue to operate Vernon Village, and their family controlled corporation, Vernon Village, Inc., owns trailers and operates a business on the land."

Attorney Giulietti's conclusion that a private sale will yield an unsatisfactory price for 325 Kelly Road is premature. We emphasize, however, that if his fear is realized, the court is not compelled to accept an inadequate offer for the property merely because a private sale has been ordered. "Because a partition by sale, although a creature of statute, is an equitable action, and because it is within the trial court's discretion to order a partition by sale, once the court has exercised its equitable jurisdiction by ordering a partition by sale, it also has discretion to approve or reject the sale." *Fernandes* v. *Rodriguez*, supra, 255 Conn. 59. Further, it is not inconceivable that a higher bid may obtain at a private sale than at a public auction. See, e.g., *Doan* v. *Doan*, 208 Or. 508, 302 P.2d 565 (1956). That is especially possible

here, where the Giulietti siblings likely place more subjective value on 325 Kelly Road than would an unrelated bidder, due to several decades of family ownership, and where they still own the corporate tenant that would need to negotiate at arms length with an unrelated landowner in determining future rental payments.

Attorney Giulietti's alternate claim that the court's order of a private sale was improper because he did not request it is without merit. Although the court in its memorandum of decision stated that "[a]ll parties" desired a private sale, such a finding is immaterial because, by the plain language of § 52-500, a consensus among the parties is not prerequisite to the court's order of a sale. Section 52-500 vests with the court the discretion to order a sale at the request of *any* of the interested parties; it does not require a request by *all* of those parties. "When language used in a statute is clear and unambiguous, its meaning is not subject to modification or construction." (Internal quotation marks omitted.) *Middlesex Ins. Co.* v. *Rady*, 34 Conn. App. 679, 682, 642 A.2d 1217, cert. denied, 231 Conn. 908, 648 A.2d 154 (1994). As long as one of the Giulietti siblings desired a private sale, it is immaterial whether attorney Giulietti himself approved of that course of action. The court, therefore, had the authority to order that sale, and it did not abuse its discretion in ordering a partition by private sale of 325 Kelly Road.

B

Attorney Giulietti next claims that the court improperly imposed a constructive trust in favor of Joanne and Anita on his quarter share of 325 Kelly Road. He argues that the trust was not a proper remedy because (1) Anita was not a plaintiff in the partition action and did not file a claim against him, (2) the complaint against him did not specifically request reimbursement for back rent or the imposition of a constructive trust, and there-

fore he was denied the opportunity to defend against its imposition or to seek indemnification or contribution from James, and (3) the amount of the constructive trust was unsupported by the evidence. We are not persuaded.

"Our general standards governing the imposition of a constructive trust are well established. [A] constructive trust arises contrary to intention and in invitum, against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy. . . . Moreover, the party sought to be held liable for a constructive trust must have engaged in conduct that wrongfully harmed the plaintiff." (Citations omitted; internal quotation marks omitted.) *Wendell Corp. Trustee* v. *Thurston*, 239 Conn. 109, 113–14, 680 A.2d 1314 (1996). "The imposition of a constructive trust by equity is a remedial device designed to prevent unjust enrichment. . . . Thus, a constructive trust arises where a person who holds title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it." (Internal quotation marks omitted.) *Banthin* v. *Shoreline Plumbing & Heating Supply Corp.*, 30 Conn. App. 637, 639, 621 A.2d 769 (1993).

A trial court's determination that a constructive trust should be imposed will not be disturbed unless it is clearly erroneous or involves an abuse of discretion. *Wendell Corp. Trustee* v. *Thurston*, supra, 239 Conn. 114. "This limited scope of review is consistent with the general proposition that equitable determinations that depend on the balancing of many factors are committed to the sound discretion of the trial court." (Inter-

nal quotation marks omitted.) Id. "In an equitable proceeding, the trial court may examine all relevant factors to ensure that complete justice is done. . . . Our review is quite limited, and is usually confined to a determination of whether the trial court's decision to award the particular equitable relief was reasonable. . . . When we review the exercise of discretion by the trial court, every reasonable presumption will be given in favor of the correctness of its ruling." (Citations omitted; internal quotation marks omitted.) *Banthin* v. *Shoreline Plumbing & Heating Supply Corp.*, supra, 30 Conn. App. 640.

1

Attorney Giulietti first claims that the court's imposition of a constructive trust on his share of 325 Kelly Road in favor of Anita was improper because Anita was not a plaintiff in the partition case and did not file any claim against him. We disagree.

Anita did not join James and Joanne in bringing the partition action against attorney Giulietti; however, she was named as a defendant in that case. She did testify at trial and was otherwise in attendance throughout the proceedings. In her testimony and in an April 23, 1999 letter[32] to the court, Anita made it clear that although

[32] Anita's letter, addressed to the court officer, Christina Burnham, states:

"Dear Attorney Burnham:

"I am writing you this letter because I am, unhappily, a party to the partition action XO3CV 98 0492096 S, involving my siblings and myself. I can no longer put off writing to you. My defendant status in this lawsuit is only because I am afraid of the bullying and voluminous paperwork my co-defendant brother, John L. Giulietti would subject me to if I became a plaintiff in this action. I also signed an agreement that stated I would not sue any of my siblings several years ago.

"With this said, I am reserving my right to change my defendant status before this case reaches its conclusion in front of Judge Aurigemma. I have been instructed that this prerogative is my legal right.

"My brother John L. Giulietti is a manipulative bully who unfortunately knows how to file documents of Connecticut law. He has worked for years to devise the cluster of legal confusion my family finds itself in. He is the reason we are using the court's time.

she was named as a defendant, her interests in the matter were aligned with those of the plaintiffs and not with attorney Giulietti. Nonetheless, she did not retain an attorney and did not file a separate complaint against her brother. Attorney Giulietti argues that this state of affairs makes Anita ineligible for the equitable relief of a constructive trust.

When a court has assumed equitable jurisdiction over a matter, "[t]he doctrine of retaining jurisdiction in order to completely adjust the controversy extends to the granting of relief to a defendant or between codefendants. On this ground [a] defendant may have relief to which he shows himself entitled against [a] plaintiff, although he does not ask for it, and even in some cases where [a] plaintiff has failed to make out his own case." 30A C.J.S. Equity § 81 (1992). The United States Supreme Court has noted that "by the flexibility of chancery practice a person whose interests in the subject of litigation are on the same side with the complainant may be made a defendant." *United States* v. *Union Pacific Railroad Co.*, 98 U.S. 569, 607, 25 L. Ed. 143 (1878).

Accordingly, the court's imposition of a constructive trust, an equitable remedy, in favor of Anita was not improper even though she was a defendant and not a plaintiff. The court, therefore, did not abuse its discretion in extending equitable relief to Anita Giulietti.

2

Attorney Giulietti next argues that the court's imposition of a constructive trust for back rent owed to his

"But he is my brother—and my co-defendant, at least for the moment. It makes my heart sick to see my name next to his in this legal action. He does not speak for me now; although for years he did as the family attorney.

"Thank you for your time.

"Sincerely,

"Anita Giulietti"

sisters was improper because the plaintiffs' complaint did not specifically set forth a claim for such relief. He claims, therefore, that he was denied the opportunity to defend against the imposition of the trust or to seek indemnification or contribution from James.[33] That claim is without merit.

The plaintiffs' complaint in the partition case alleged malpractice, misrepresentation and breach of fiduciary duty, and requested the following relief: "Count one: 1. A partition of 325 Kelly Road, Vernon, Connecticut, 06066. 2. The appointment of a Committee to accomplish the sale of 325 Kelly Road. 3. A division of any and all sale proceeds among the parties having a proven and established interest therein after payment of expenses of the Committee sale, according to their respective legal and equitable interests. 4. Such other and further relief that the court may deem necessary or appropriate. Count two: 1. A reformation in equity of the interests of the four parties to this matter to 25 percent each ownership in 325 Kelly Road, Vernon."

Practice Book § 10-27 provides that "[a] party seeking equitable relief shall specifically demand it as such, *unless the nature of the demand itself indicates that the relief sought is equitable relief.*" (Emphasis added.) "Where the nature of the case and the nature of the plaintiff's demand is such that equitable relief is clearly being sought, a specific demand for equitable relief is not necessary." *Dorsey* v. *Mancuso*, 23 Conn. App. 629, 634, 583 A.2d 646 (1990), cert. denied, 217 Conn. 809, 585 A.2d 1234 (1991). Thus, in *Cohen* v. *Cohen*, 182

---

[33] The court, though noting that James was not completely blameless regarding the fraud committed on Mr. Giulietti and Alma, found that attorney Giulietti was the prime wrongdoer, that he had made misrepresentations to James and that his conduct was especially egregious because he was acting in a fiduciary position and as an attorney. As such, the court imposed the constructive trust only against a portion of attorney Giulietti's postreformation, fractional share of 325 Kelly Road and not against James' share.

Conn. 193, 438 A.2d 55 (1980), our Supreme Court rejected a claim that it was improper for a trial court to give an instruction on the theory of resulting trust where the plaintiff did not include a request for a resulting trust in her complaint. The court found it adequate that the facts alleged in the complaint "amply support[ed] application of the principle of a resulting trust," and the plaintiff had requested "other equitable relief to which she may have been entitled." Id., 201.

Similarly, a court order of partition by sale was upheld in *Balzano* v. *Balzano*, 135 Conn. 584, 590, 67 A.2d 409 (1949), although the plaintiff's complaint contained only "a general prayer for 'such other relief as to equity may appertain.' " The court held that this was appropriate, noting that "[a]ny relief can be granted under the general prayer which is consistent with the case stated in the complaint and is supported by the proof 'provided the defendant will not be surprised or prejudiced thereby.' " Id.; see also *Cottrell* v. *Cottrell*, 106 Conn. 411, 420–21, 138 A. 458 (1927).

"In order for a constructive trust to be imposed, the plaintiff must allege fraud, misrepresentation, imposition, circumvention, artifice or concealment, or abuse of confidential relations. *Worobey* v. *Sibieth*, 136 Conn. 352, 356, 71 A.2d 80 (1949)." *Wing* v. *White*, 14 Conn. App. 642, 644, 542 A.2d 748 (1988). "Courts may use the equitable device of a constructive trust to remedy the unjust enrichment which results from not disposing of property as promised after the promise induced someone with whom the promisor shared a confidential relationship to transfer the property to the promisor." *Starzec* v. *Kida*, 183 Conn. 41, 49, 438 A.2d 1157 (1981).

In this case, the plaintiffs' complaint included both requests for specific equitable relief, and a general prayer for other and further relief as the court deemed necessary and appropriate. Therefore, it was clear from

the complaint that equitable relief was being sought, even though the plaintiffs did not specifically request a constructive trust. Further, considering the allegations set forth in the complaint, attorney Giulietti's assertions that he was denied the opportunity to defend specifically against the imposition of a constructive trust for back rent owed, or to seek indemnification or contribution from James, are untenable. The plaintiffs' complaint alleged, inter alia, malpractice, misrepresentation and breach of fiduciary duty, resulting in a property distribution undesired by Mr. Giulietti, as the bases underlying their requests for reformation of the deeds and partition of the property. As such, attorney Giulietti received precisely the notice necessary to defend against the imposition of a constructive trust or to seek indemnification or contribution from James because relief in the form of a constructive trust was fully consistent with the case stated in the plaintiffs' complaint.[34] Last, the plaintiffs specifically argued for the imposition of a constructive trust in their posttrial brief, providing calculations underlying the claimed amount with supporting citations to the trial record. Attorney Giulietti thus was free to respond in his own posttrial brief, setting forth any applicable defenses, alternate calcula-

---

[34] Attorney Giulietti's argument that he was unaware that a reformation of the property interests would entail a retrospective adjustment of the associated rental payments is meritless. It is abundantly clear from the record that he had intimate awareness of, indeed, that he was the architect of, the scheme whereby each sibling's rent receipts were proportionate to his or her percentage ownership of 325 Kelly Road. Furthermore, "[u]pon the reformation of an instrument, the general rule is that it relates back to, and takes effect from, the time of its original execution, as between the parties thereto . . . . The rights of the parties are measured by the instrument as originally intended, and the effect of the reformation, as a whole, is to give *all the parties all the rights to which they are equitably entitled under the instrument which they intended to execute.*" (Emphasis added.) 66 Am. Jur. 2d, Reformation of Instruments § 11 (1973). Pursuant to that rule, the imposition of the constructive trust for unpaid back rent naturally followed the reformation of the deed.

tions or arguments in support of indemnification or contribution.

The court did not abuse its discretion in imposing a constructive trust on attorney Giulietti's share of 325 Kelly Road because such equitable relief was warranted by the plaintiffs' complaint and no surprise or prejudice resulted.[35]

3

Attorney Giulietti claims finally that the court's determination of damages as reflected in the amount of the constructive trust was unsupported by the evidence. We disagree.

The proper amount of a constructive trust imposed to remedy unjust enrichment is a question of fact for the trier, akin to a determination of damages. "The standard of review for an appellate court is whether the damages [represented by the trust] fall within the limits of fair and reasonable compensation in the particular case, or whether the [amount] so shocks the sense of justice as to compel the conclusion that the [court] was influenced by partiality, prejudice, mistake or corruption." *Kelley* v. *Montesi*, 14 Conn. App. 104, 105–106, 539 A.2d 1020 (1988). "Although damages often are not susceptible of exact pecuniary compensation and must be left largely to the sound judgment of the trier . . . this situation does not invalidate a damage award as long as the evidence afforded a basis for a reasonable estimate by the [trier] of that amount. . . . Mathemati-

---

[35] In his brief to this court, attorney Giulietti also asserts that he "was denied the procedural and substantive right to assert defenses, including ratification, laches and the statute of limitation." Because he provides sparse analysis, however, as to the viability of those defenses under the facts of this case, we are not convinced that he was "prejudiced" by the lack of a specific request in the complaint for a constructive trust. Furthermore, we note, attorney Giulietti did not bother to set forth any of those defenses in his posttrial brief even though it was clear at that point, from the plaintiffs' posttrial brief, that a constructive trust was being sought.

cal exactitude in the proof of damages is often impossible . . . . The determination of damages involves a question of fact that will not be overturned unless it is clearly erroneous." (Citation omitted; internal quotation marks omitted.) *Lawson* v. *Whitey's Frame Shop*, 241 Conn. 678, 689–90, 697 A.2d 1137 (1997).

Our review indicates that the constructive trust in the amount of $120,858 was based on the evidence[36] and was well within the court's discretion. Our examination of all the evidence in this case fails to disclose that the trial court acted other than in accordance with the law in its determination of the amount of the constructive trust. The amount fairly and reasonably compensated the sisters for the back rent they were deprived of by attorney Giulietti's actions and was not clearly erroneous.[37]

---

[36] The court adopted the calculations set forth in a schedule included with the plaintiffs' posttrial brief. That schedule cross-referenced several exhibits introduced at trial in support of the figures included therein. Attorney Giulietti in his response brief did not submit his own calculation of back rent owed to his sisters, but argued only that the claim was unwarranted by the pleadings. See part II B of the partition action portion of this opinion.

[37] Attorney Giulietti in his appellate brief urges that a determination of the back rent owed to his sisters must be made by reference to the actual rental payments made to the siblings during the periods in question. That argument ignores the fact that the Giuliettis, essentially, were both tenants and landlords in the Vernon Village enterprise. No written lease existed between Vernon Village, Inc., and the 325 Kelly Road landowners; therefore, the amount of rent payable was subject to continual adjustment. As such, any calculation of back rent rightly owed to the sisters necessarily is an exercise in imprecision. In light of the fact that attorney Giulietti, in his various roles as his father's trusted adviser, fractional landowner, Vernon Village, Inc., officer and Vernon Village, Inc., stockholder, was in a position to influence the amounts of rent paid by Vernon Village, Inc., to the siblings (as well as the salary that he received from Vernon Village, Inc.), the amount of the *actual* rental payments is not conclusive as to a determination of what *ought* to have been paid.

Attorney Giulietti also insists that he was not "unjustly enriched" by deficient rent payments to his sisters because "[t]he party which received the economic benefit of the reduced rent was not the appellant, it was the tenant: Vernon Village, Inc." In that attorney Giulietti held half of the corporate stock of Vernon Village, Inc., and, therefore, benefited indirectly, that argument is specious.

## III

### THE CORPORATE DISSOLUTION ACTION

We next consider the action brought by James requesting judicial dissolution of Vernon Village, Inc., pursuant to General Statutes § 33-896.[38] Attorney Giulietti claims that the court improperly refused to enter a stay of the proceedings after he filed an election to purchase James' shares of Vernon Village, Inc., and improperly disallowed him from purchasing those shares. We disagree because we agree ·with the trial court's determination that the matter was moot.

The court made the following additional findings regarding the corporate dissolution action. At the time that James commenced the action, he and attorney Giulietti each owned five of the ten shares of issued and outstanding common stock of Vernon Village, Inc. Further, at that time, the board of directors of Vernon Village, Inc., was comprised of only James and attorney Giulietti, and there existed a deadlock between them which, because of the corresponding equal stock ownership, could not be resolved by a shareholder vote. Attorney Giulietti responded to the filing of the dissolution action by filing an election to purchase James' shares of Vernon Village, Inc., pursuant to General Statutes § 33-900.

Thereafter, the court found, on the basis of its reformation of the ownership of the Vernon Village, Inc., stock in the fraud and malpractice action, that the deadlock between James and attorney Giulietti no longer

---

[38] General Statutes § 33-896 (b) provides in relevant part: "The superior court for the judicial district where the corporation's principal office or, if none in this state, its registered office, is located shall dissolve a corporation . . . (2) in a proceeding by a shareholder or a director when it is established that (A) under the provisions of sections 33-600 to 33-998, inclusive, or of the certificate of incorporation or bylaws, the directors are deadlocked in the management of the corporate affairs and the shareholders are unable to break the deadlock . . . ."

existed and, therefore, the corporate dissolution action was moot. The court further held that even if the action were *not* moot, attorney Giulietti's election to purchase James' shares must fail for equitable reasons, those being that (1) it was attorney Giulietti's fraudulent conduct that led to the deadlock situation and (2) James was the sibling who actually had operated the mobile home business for many years.

"Mootness presents a circumstance wherein the issue before the court has been resolved or had lost its significance because of a change in the condition of affairs between the parties." (Internal quotation marks omitted.) *E & A Development, Inc.* v. *Paragon Builders of Connecticut, Inc.*, 54 Conn. App. 355, 360, 735 A.2d 830 (1999), appeal dismissed, 252 Conn. 773, 749 A.2d 1184 (2000). "Since mootness implicates subject matter jurisdiction . . . it can be raised at any stage of the proceedings. . . . A case becomes moot when due to intervening circumstances a controversy between the parties no longer exists. . . . An issue is moot when the court can no longer grant any practical relief." (Citations omitted; internal quotation marks omitted.) *Twichell* v. *Guite*, 53 Conn. App. 42, 51–52, 728 A.2d 1121 (1999). Since mootness raises a question of law; see *Mannweiler* v. *LaFlamme*, 232 Conn. 27, 35, 653 A.2d 168 (1995); our review of that issue is plenary.

Under the circumstances of this case, the court correctly found that the corporate dissolution action was moot and, hence, that attorney Giulietti's associated election to purchase James' shares also must fail. Section 33-896 (b) provides in relevant part that "[t]he superior court . . . shall dissolve a corporation . . . (2) in a proceeding by a shareholder or a director *when it is established that* (A) . . . *the directors are deadlocked in the management of the corporate affairs and the shareholders are unable to break the deadlock* . . . ." (Emphasis added.) The court's reformation of

the ownership of the shares of Vernon Village, Inc., on the basis of its finding that attorney Giulietti had effected the stock transfer via fraud, effectively broke the corporate deadlock that was the basis for James' bringing the dissolution action by creating four equal shareholders to replace the two who were diametrically opposed. Given those intervening circumstances, which eliminated the deadlock controversy that was a prerequisite to an order of dissolution under § 33-896, the court properly determined that the matter was moot.

Attorney Giulietti continues to argue, in essence, that once the dissolution and share purchase election mechanisms were set in motion, the court in the circumstances of this case was powerless to halt the proceedings. He claims in that regard that the court improperly refused to stay the proceedings so as to allow him to pursue his election to purchase James' shares of Vernon Village, Inc., advised him that he was free to present evidence of the fair market value of those shares without first granting that stay and discontinued the corporate dissolution proceedings, thereby disallowing his proposed election to progress. We reject those claims.

The court in its memorandum of decision noted that even if the corporate dissolution action were not moot, attorney Giulietti would be precluded from purchasing James' shares for equitable reasons. Subsection (a) of § 33-900 provides in relevant part that "[a]n election pursuant to this section [to purchase shares of a corporation for which a dissolution action has been brought pursuant to § 33-896] shall be irrevocable *unless the court determines that it is equitable to set aside or modify the election*." (Emphasis added.) Subsection (b) of § 33-900 provides in relevant part that "[a]fter an election [to purchase shares] has been filed by the corporation or one or more shareholders, the [corporate dissolution proceedings] may not be discontinued or

settled . . . *unless the court determines that it would be equitable to the corporation and the shareholders, other than the [shareholder who petitioned for dissolution] to permit such discontinuance [or] settlement . . . ."* (Emphasis added.) The plain language of the statute, therefore, gives the court the discretion both to discontinue the corporate dissolution proceedings and to revoke a shareholder's election to purchase the shares of the petitioner when in the court's judgment it would be equitable to do so.

Attorney Giulietti argues that in exercising the discretion to discontinue the dissolution proceedings, the court here improperly considered what was equitable to James, the shareholder petitioning for dissolution. We note, however, that there is no indication from the court's decision that it considered only what was equitable as to James; the court, after the share reformation, was obligated also to consider what was fair and equitable to Joanne, Anita and Vernon Village, Inc., itself, and there is nothing to indicate that it did not do so.

Attorney Giulietti also claims that pursuant to § 33-900 (a), the court could set aside his election to purchase James' shares only if it were equitable to attorney Giulietti. He argues without citation to any controlling authority that the court, in deciding whether to exercise its discretion to set aside an election, is precluded from considering equities other than what is fair to the electing shareholder himself. We, however, do not see any such qualification in the plain language of the statute and decline to insert it by implication.

The court properly discontinued the corporate dissolution and share purchase election proceedings because they were moot and because it was within its equitable discretion to do so.[39]

---

[39] Because we already have found that the court properly discontinued the proceedings, we do not address attorney Giulietti's claims that it improperly declined to issue a stay and advised him that he could present valuation evidence without first issuing a stay. Because we could not grant him any

IV

## THE USURPATION OF CORPORATE
## OPPORTUNITY ACTION

The final case we review on appeal is an action brought by James, on behalf of Vernon Village, Inc., accusing attorney Giulietti of usurping a corporate opportunity.[40] Additional facts are necessary to our resolution of the issues raised herein. The trial court found the following to have occurred.

In mid-1997, James Capo, a cousin of the Giulietti siblings, visited the office of Vernon Village, Inc., where he spoke with attorney Giulietti. Capo told attorney Giulietti that the Capo family wanted to sell two parcels of land adjacent to 325 Kelly Road. The parcels had been owned by Neva Capo, James Capo's mother and Mr. Giulietti's sister, who recently had died. Two mobile homes were located on one of the Capo parcels. The mobile homes were dependent on Vernon Village for water, electricity and sewer services.

Attorney Giulietti spoke with Mr. Giulietti and suggested they purchase the Capo parcels. Attorney Giulietti negotiated with the Capo family, securing an agreement whereby he and his father purchased the land and the mobile homes for $22,500. Mr. Giulietti contributed $20,700 toward the purchase price, while attorney Giulietti contributed $1800. Attorney Giulietti had the deeds effectuating the transfer prepared, instructing the preparer that he and his father should be designated therein as joint tenants with rights of

---

practical relief by deciding the merits of those claims, they are moot. See *In re Amelia W.*, 62 Conn. App. 500, 505, 772 A.2d 619 (2001) (appellate court may not decide moot questions disconnected from granting of actual relief).

[40] Mr. Giulietti also was named as a defendant at attorney Giulietti's behest. Mr. Giulietti interposed no defense to the action and agreed to be bound by the court's decision.

survivorship. At the time, Mr. Giulietti was eighty-two years old.

Prior to closing on the purchase, attorney Giulietti spoke with Joanne by telephone, telling her that he was going to purchase the Capo properties. Joanne objected, telling attorney Giulietti that the land should "go to Vernon Village." Attorney Giulietti responded that "that is not going to happen because then James will get his mitts on it." On the morning of the closing, attorney Giulietti apprised James that the property was for sale and that he was purchasing it. James also protested, advising attorney Giulietti that Vernon Village, Inc., should be the purchaser. Attorney Giulietti nonetheless proceeded to close on the purchase.

At the times of those events, the Vernon Village, Inc., board of directors consisted of attorney Giulietti, James and Joanne. James was the president of Vernon Village, Inc., and attorney Giulietti was the secretary. Subsequent to attorney Giulietti's purchase of the property, Joanne resigned from her position as director, leaving the board comprised only of James and attorney Giulietti. Thereafter, James, acting as the president, brought an action on behalf of Vernon Village, Inc., accusing attorney Giulietti of usurping a corporate opportunity. James did not seek approval of the Vernon Village, Inc., board of directors prior to commencing the action.

After trial, the court found that the chance to purchase the Capo property constituted a corporate opportunity for Vernon Village, Inc., and that attorney Giulietti, as an officer and director of Vernon Village, Inc., had wrongfully usurped that opportunity in breach of his fiduciary duty to the corporation. The court ordered a constructive trust imposed on the property for the benefit of Vernon Village, Inc., such trust to continue until attorney Giulietti and Mr. Giulietti, or his

estate, transfer the property to Vernon Village, Inc., in exchange for the purchase price plus interest. The court, pursuant to General Statutes § 33-743, then removed attorney Giulietti from his position as a director of Vernon Village, Inc. Additional facts will be set forth where relevant to the claim being addressed.

## A

Attorney Giulietti claims first that the court improperly failed to find that the usurpation of corporate opportunity action was not properly authorized. He argues that the action was improper because it was brought by James, the president of Vernon Village, Inc., without his first seeking approval from the board of directors.[41] We disagree.

Whether an officer of a corporation has the authority to bring an action on behalf of the corporation is a question of standing. See *Community Collaborative of Bridgeport, Inc.* v. *Ganim*, 241 Conn. 546, 552–55, 698 A.2d 245 (1997). "If a party is found to lack standing, the court is without subject matter jurisdiction to determine the cause. . . . Further, the court has a duty to dismiss, even on its own initiative, any [portion of the] appeal that it lacks jurisdiction to hear." (Citation omitted; internal quotation marks omitted.) *Ramos* v. *Vernon*, 254 Conn. 799, 808, 761 A.2d 705 (2000). "Our determination of a trial court's subject matter jurisdiction is a question of law and, therefore, our review is plenary." *Brennan* v. *Fairfield*, 58 Conn. App. 191, 195, 753 A.2d 396 (2000), rev'd on other grounds, 255 Conn. 693, 768 A.2d 433 (2001).

---

[41] Attorney Giulietti claims further impropriety in the fact that James, some time prior to bringing the usurpation of corporate opportunity action, filed an action seeking the dissolution of Vernon Village, Inc. Because his brief contains no argument or legal analysis on that point, we will not address it. See *Mullen & Mahon, Inc.* v. *Mobilmed Support Services, LLC*, supra, 62 Conn. App. 10.

The affairs of Connecticut corporations are governed by the Connecticut Business Corporation Act (CBCA), codified in General Statutes §§ 33-600 to 33-998. General Statutes § 33-764 provides that "[e]ach officer [of a corporation] has the authority and shall perform the duties set forth in the bylaws or, to the extent consistent with the bylaws, the duties prescribed by the board of directors or by direction of an officer authorized by the board of directors to prescribe the duties of other officers." That section is "the only guidance on the authority or duties of officers provided by the CBCA." M. Ford, Connecticut Corporation Law & Practice (2d Ed. 2000) § 5.06, p. 5-25. One commentator notes that although Connecticut case law does not clearly delineate the power and authority of officers in making corporate decisions absent a specific grant in the corporate bylaws, "[i]t is clear that the courts have abandoned the idea that corporate officers have no implied powers . . . ." Id., p. 5-27.

Article II, § 1, of the bylaws of Vernon Village, Inc., provides that "[t]he affairs and business of this Corporation shall be managed by a Board of three Directors . . . ." Article II, § 4, provides that "[t]he Board of Directors shall have the control and general management of the affairs and business of the Company," and that "[s]uch Directors shall in all cases act as a Board, regularly convened, by a majority . . . ." Article III, § 3, of the bylaws, governing the duties of the corporate president, provides that, among other things, "[h]e shall sign and make all contracts and agreements in the name of the Corporation," "[h]e shall have general direction and management of the affairs of the Corporation," and "[h]e shall enforce these By-Laws and perform all the duties incident to the position and office, and which are required by law." The bylaws, though conveying to James, as the president, broad powers to bind Vernon Village, Inc., and to direct its affairs, do not specifically

grant him the authority to commence an action on its behalf. The bylaws, however, also do not explicitly require board approval of all actions of the president. Further, although the bylaws give the board of directors "control" over the affairs of Vernon Village, Inc., they also require that there be three directors and that they exercise that control by majority vote.

The facts of this case are very similar to those in *Zaubler* v. *West View Hills, Inc.*, 148 Conn. 540, 172 A.2d 604 (1961), in which our Supreme Court approved, indirectly, a plaintiff president-director's institution of an action on behalf of the corporation against its other two directors, without first obtaining board authorization. In *Zaubler*, the plaintiff brought an action in a New York court, accusing the defendants of fraudulent diversion of assets from the corporation, which was based in Connecticut. The New York Court of Appeals approved the action and allowed it to go forward, holding that the plaintiff had "presumptive authority" to cause the corporation to institute such an action where there was no contrary provision in the bylaws and no prohibitory action by the board of directors. *West View Hills, Inc.* v. *Lizau Realty Corp.*, 6 N.Y.2d 344, 348, 160 N.E.2d 622, 189 N.Y.S.2d 863 (1959). Thereafter, the defendant directors removed the plaintiff from his positions as president and director, and threatened to cause the corporation to withdraw the New York action. The plaintiff responded by seeking relief in the Connecticut court, requesting that it enjoin the defendants from withdrawing the New York action. The Connecticut court issued that injunction and the defendants appealed.

Our Supreme Court upheld the injunction, noting approvingly the holding of the New York Court of Appeals. *Zaubler* v. *West View Hills, Inc.*, supra, 148 Conn. 543. Our Supreme Court explained that "[t]he conflict of interests is obvious" where the directors

"stand in a dual relation which prevents an unprejudiced exercise of judgment." (Internal quotation marks omitted.) Id., 545. The court noted that "[i]t would indeed be a strange rule . . . which would permit these directors to avoid all liability, regardless of the merit of [the corporation's] claims, by the simple expedient of utilizing their power as directors to withdraw [the corporation's] suit against themselves." Id., 546.

The result would be equally strange here if James were forced to obtain attorney Giulietti's approval to bring an action on behalf of Vernon Village, Inc., against attorney Giulietti. The obvious conflict of interests is demonstrated by attorney Giulietti's testimony at trial admitting that had the issue been presented to the board, he would have voted against authorizing an action against himself or, alternatively, he would have had to recuse himself from voting as an interested party. As such, the board would have been deadlocked, one to one on authorizing the action or the action would have been approved in a one to zero vote. Under the first alternative, any vote would have been pointless.[42] Under the latter, the action would have gone forward as it did. We note in that regard that the law does not require the performance of a useless act. *Barrett-Nonpareil, Inc.* v. *Stoll*, 168 Conn. 79, 83, 357 A.2d 481 (1975); *Lebowitz* v. *McPike*, 157 Conn. 235, 246, 253 A.2d 1 (1968); *Janulewycz* v. *Quagliano*, 88 Conn. 60, 64, 89 A. 897 (1914); *State* v. *Tubbs*, 52 Conn. App. 636, 640, 727 A.2d 776 (1999).

---

[42] Further, the bylaws of Vernon Village, Inc., require a concurrence between James and attorney Giulietti to fill the vacancy on the board of directors. As such, attorney Giulietti indefinitely could prevent any breaking of the tie vote by refusing to agree to the appointment of a third director. James testified at trial that prior to his institution of the usurpation of corporate opportunity action, he moved at a board of directors' meeting that Joanne be reinstated as director. Because attorney Giulietti refused to second the motion, however, it was not even voted on, and Joanne was not reinstated. The lack of a third director necessarily would frustrate any effort by James to obtain majority board authorization for bringing an action.

Attorney Giulietti's reliance on *Community Collaborative of Bridgeport, Inc.* v. *Ganim,* supra, 241 Conn. 546, wherein the court rejected a claim that an officer-chairperson had authority to bring an action on behalf of her corporation, is misplaced because the facts of that case are readily distinguishable. First, the action brought by the officer was not against members of the board of directors, but against outside third parties. Second, the corporate bylaws provided specifically that "[t]he president . . . [was] subject to the control of the Board of Directors . . . ." Id., 548. Third, the board had passed an authorization that allowed an action to be brought by *both* chairpersons; however, the plaintiff had acted unilaterally and contrary to the desire of the other chairperson. Id., 549.

In this case, James' institution of an action against attorney Giulietti was not inconsistent with the bylaws of Vernon Village, Inc., or any board of directors' resolution. Given the structure of the board of Vernon Village, Inc., and attorney Giulietti's obvious conflict of interest, seeking prior approval for the action would have been pointless. The court, therefore, properly refused to find that James lacked standing to bring the action on behalf of Vernon Village, Inc.

### B

Attorney Giulietti next argues that the court improperly found that the chance to purchase the Capo property constituted a corporate opportunity for Vernon Village, Inc. We disagree.

"[W]hether a corporate opportunity exists is a factual question to be decided by reasonable inferences from objective facts." (Internal quotation marks omitted.) *Ostrowski* v. *Avery,* 243 Conn. 355, 365, 703 A.2d 117 (1997). "[W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by

the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." *Pandolphe's Auto Parts, Inc.* v. *Manchester*, supra, 181 Conn. 221–22.

In determining whether the chance to purchase the Capo property was a corporate opportunity, the court employed the avowed business purpose test. "The avowed business purpose test . . . is a variant of the 'line of business' test, one of the leading tests of corporate opportunity. This test asks whether the opportunity is 'closely associated with the existing and prospective activities of the corporation . . . .' " *Ostrowski* v. *Avery*, supra, 243 Conn. 366. Factors to consider include "(1) whether the business opportunity was one in which the complaining corporation had an interest or an expectancy growing out of an existing contractual right; (2) whether there was a close relationship between the opportunity and the corporation's business purposes and current activities; and (3) whether the business areas contemplated by the opportunity were readily adaptable to the corporation's existing business, in light of its fundamental knowledge, practical experience, facilities, equipment, and personnel." Id.

In finding that the latter two factors were present in this case and, therefore, that "[t]he ability to purchase the Capo properties was clearly a corporate opportunity," the court relied on the following facts. "The corporation owned mobile homes and operated on land adjacent to the Capo land. The corporation's employees, tools and materials located on the site were readily available to service and repair the mobile homes located on the Capo land. Moreover, the utilities that service the Capo mobile homes run through the 325 Kelly Road land on which Vernon Village operates. If Vernon Village, Inc., had purchased the properties, it could have immediately expanded its operations to those proper-

ties and could have begun leasing the two mobile homes thereon with minimal time and expense."

Our review of the record discloses that there is ample support for those factual findings; in fact, they are uncontested. Attorney Giulietti instead argues, as he did at trial, that the chance to purchase the Capo property could not be a corporate opportunity because it was not Vernon Village, Inc., that owned 325 Kelly Road, but the siblings as individuals. Therefore, he urges, ownership of the Capo property would be a vastly different undertaking from the current line of business of Vernon Village, Inc. We, as did the trial court, reject that analysis. Pursuant to the avowed business purpose test, the potential opportunity need not be identical to the corporation's current activities. Only a "close relationship" is required. In that the Capo property was directly adjacent to 325 Kelly Road and already housed two mobile homes dependent on the Vernon Village infrastructure, and because the business of Vernon Village, Inc., was the operation of a mobile home park, it cannot be seriously argued that this standard was unmet.

Attorney Giulietti also urges that the chance to purchase the Capo property could not be a corporate opportunity because in the past, under his parents' ownership and management, Vernon Village, Inc., refrained from purchasing land and instead leased it. The court, however, properly focused on the present management and ownership and the evolving business of Vernon Village, Inc., noting that Vernon Village, Inc., indeed had expanded into land ownership via its percentage interest in the Rockledge development. As previously stated, a proper inquiry under the avowed business purpose test considers the *existing and prospective* corporate activities, not the distant past under prior management and ownership.

The court's finding that the chance to purchase the Capo property was a corporate opportunity for Vernon

Village, Inc., was not clearly erroneous, as its factual findings are supported by the record and its analysis was legally and logically correct.

## C

Attorney Giulietti next claims that the court, in imposing a constructive trust on the Capo property until attorney Giulietti and Mr. Giulietti transferred it to Vernon Village, Inc., in exchange for reimbursement of the purchase price, improperly allocated the amount of reimbursement between himself and Mr. Giulietti. We are not convinced.

The court imposed a constructive trust on the Capo property, to continue until attorney Giulietti and Mr. Giulietti transferred the property to Vernon Village, Inc., in exchange for the 1997 purchase price plus interest. The court considered that Mr. Giulietti had provided $20,700 of the purchase price while attorney Giulietti contributed the remaining $1800. Accordingly, it ordered that, in exchange for the land, Vernon Village, Inc., should pay Mr. Giulietti or his estate $20,700 plus interest and should pay attorney Giulietti $1800 plus interest. Attorney Giulietti claims that this allocation was improper and that he should be reimbursed for a full half of the purchase price. He argues that of the $20,700 provided by his father, $10,047 was in fact a gift that was given to him just prior to the purchase to assist him in acquiring his one-half interest and, therefore, he is entitled to be reimbursed for that amount as well as for his $1800 contribution.

There is no dispute that Mr. Giulietti provided all but $1800 of the purchase price for the Capo property. The only question is whether he intended that $10,047 be a gift to attorney Giulietti.[43] "A question of intent [as to

[43] Attorney Giulietti's characterization of the issue as whether the court improperly granted Mr. Giulietti recovery on an unpleaded cross claim is inaccurate. The court did not order that he reimburse his father $10,047, thereby "negat[ing] the gift."

the making of a gift] is a question of fact, the determination of which is not reviewable unless the conclusion drawn by the trier is one which cannot be reasonably made." (Internal quotation marks omitted.) *Bachmann v. Reardon*, 138 Conn. 665, 667, 88 A.2d 391 (1952). The determination of the parties' intent at the time of the transfer in this case depended in large part on the court's assessment of the credibility of the witnesses because no documentation was produced to evidence a gift. See *Colonial Bank & Trust Co.* v. *Matoff*, 18 Conn. App. 20, 29, 556 A.2d 619 (1989).

As support for his assertion that the funds were a gift, attorney Giulietti directs us only to his testimony at trial in which he claimed as much.[44] In considering, apparently, that the court was bound to accept that testimony as "undisputed evidence," attorney Giulietti misconstrues the prerogative of the trier of fact. "The trial court . . . is not bound by the uncontradicted testimony of any witness . . . and is in fact free to reject such testimony." (Internal quotation marks omitted.) *In re Deana E.*, 61 Conn. App. 197, 208, 763 A.2d 45 (2000), cert. denied, 255 Conn. 941, 768 A.2d 949 (2001). "[T]he trial court is free to accept or reject, in whole or in part, the evidence presented by any witness, having the opportunity to observe the witnesses and gauge their credibility." *State* v. *Sandra O.*, 51 Conn. App. 463, 468, 724 A.2d 1127 (1999). "This court defers to the trial court's discretion in matters of determining credibility and the weight to be given to a witness' testimony." *State* v. *Garuti*, 60 Conn. App. 794, 797, 761 A.2d 774 (2000), cert. denied, 255 Conn. 931, 767 A.2d 102 (2001).

---

[44] Mr. Giulietti's deposition testimony on the matter does not mention any gift. In fact, while explaining why he "didn't like the arrangement" with the Capo property, Mr. Giulietti testified that "number one, [attorney Giulietti] never asked me where the money was coming from. . . . I had the right to write checks on my wife's account, on one of her accounts. And as I think, I think it happened this way, that a check was drawn, and he brought it over to me. I signed it, so that came out of my wife's account, $18,000."

"We cannot retry the matter, nor can we pass on the credibility of a witness." (Internal quotation marks omitted.) *Channer* v. *State*, 54 Conn. App. 620, 630, 738 A.2d 202, cert. denied, 251 Conn. 910, 739 A.2d 1247 (1999).

The trial court was in the best position to judge the credibility of attorney Giulietti's testimony, and we cannot say that the conclusion it drew therefrom was unreasonable. We hold that the court did not act improperly when it allocated the reimbursement of the purchase price for the Capo property as it did.

D

Attorney Giulietti's final claim in the usurpation of corporate opportunity action is that the court improperly removed him as a corporate director of Vernon Village, Inc. He argues, essentially, that the evidence was insufficient to support such a removal. We disagree.

General Statutes § 33-743 (a) provides in relevant part: "The superior court . . . may remove a director of [a] corporation from office in a proceeding commenced . . . by the corporation . . . if the court finds that (1) the director engaged in fraudulent or dishonest conduct or gross abuse of authority or discretion, with respect to the corporation and (2) removal is in the best interest of the corporation." The statutory criteria for removal contemplate certain factual findings as a basis for the court's exercise of its discretion. Therefore, we review the court's determinations using the clearly erroneous standard. See *Pandolphe's Auto Parts, Inc.* v. *Manchester*, supra, 181 Conn. 221–22.

The court exercised its statutory authority to remove attorney Giulietti as a director of Vernon Village, Inc., after finding that he had "engaged in dishonest conduct with respect to the corporation by virtue of his usurpation of the corporate opportunity." The court also found

that his continuation as a director would not be in the best interest of Vernon Village, Inc., noting the evidence put forth at trial that attorney Giulietti as the "de facto treasurer" of Vernon Village, Inc., had improperly refused to sign checks on behalf of the corporation, that he was disruptive at board of directors meetings and that over the years, he had no significant involvement in the day-to-day management of the mobile home park.

Attorney Giulietti claims that the court's action was improper because it was based on the erroneous findings that James was authorized to bring the action on behalf of Vernon Village, Inc., and that attorney Giulietti had usurped a corporate opportunity. Because we already have found those findings to be proper, we need not revisit them. Attorney Giulietti also argues that there was no evidence supporting the court's findings that he was disruptive at board meetings and that he had refused to sign checks. We disagree.

Prior to commencing trial on the usurpation of corporate opportunity and corporate dissolution actions, the court heard evidence and argument on the preliminary matter of whether attorney Giulietti's check signing privileges for Vernon Village, Inc., should be terminated. It was uncontested at that hearing that attorney Giulietti had refused to sign a $50,000 check to satisfy a debt owed by Vernon Village, Inc., to Mr. Giulietti, which check had been authorized by James as president of Vernon Village, Inc. Furthermore, the court heard evidence that attorney Giulietti had refused to sign a second check payable to the firm representing Vernon Village, Inc., in the usurpation of corporate opportunity action.[45] Additionally, James, in explaining why he did

[45] The court terminated attorney Giulietti's check signing authority, noting that it was "untenable to have someone involved in litigation with the corporation" to have such authority.

not call a board of directors' meeting to authorize the action or to demand conveyance of the Capo property to Vernon Village, Inc., testified that attorney Giulietti could not be talked to, that he would slam his fist on the table and would threaten litigation. Therefore, the court's findings that attorney Giulietti had refused to sign checks and was disruptive were supported by the evidence.

Because the factual findings establishing that the statutory criteria were met were not clearly erroneous, we hold that the court properly removed attorney Giulietti as a director of Vernon Village, Inc., pursuant to § 33-743.

The judgments are affirmed.

In this opinion the other judges concurred.