******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

HALINA OSTAPOWICZ *v.* JERZY WISNIEWSKI
(AC 43944)

Alexander, Clark and Sheldon, Js.

*Syllabus*

The plaintiff appealed from the judgment of the trial court dissolving her
marriage to the defendant. She claimed that the court lacked subject
matter jurisdiction to enforce the parties' premarital agreement, erred
in finding that certain property constituted the defendant's separate
property under that agreement and abused its discretion in assigning
to her the debt on the parties' home equity line of credit. *Held*:

1. The plaintiff could not prevail on her claim that the trial court lacked
   subject matter jurisdiction to enforce the parties' premarital agreement:
   although the defendant did not comply with the specific pleading require-
   ments of the rule of practice (§ 25-2A), as he did not file a demand for
   enforcement of the agreement in his prayer for relief, the court, noting
   that § 25-2A permits the court to exercise its discretion with respect
   to the time to demand enforcement of an agreement, found that the
   defendant's filing of a notice containing the agreement constituted a
   demand for the enforcement of the agreement; moreover, the court
   had statutory (§ 46b-1) jurisdiction over the dissolution of the parties'
   marriage, including the premarital agreement, and the rules of practice
   do not implicate a court's subject matter jurisdiction.

2. The trial court did not abuse its discretion in classifying and assigning
   the defendant's separate property interests pursuant to the parties' pre-
   marital agreement: the plaintiff did not challenge the court's findings
   that the defendant had complied with the provisions of the agreement
   related to record keeping and that the plaintiff had removed certain of
   the defendant's financial records from the marital home, making it diffi-
   cult for the defendant to trace his property interests in detail; moreover,
   the court credited the testimony of witnesses that the defendant's family
   business was an informal venture, and it made detailed findings concern-
   ing the value of the family business assets at the time of the parties'
   marriage and at trial; furthermore, the court did not assign to either
   party the other party's interest in the family business, thus, the court
   did not err in not placing a total value on the defendant's interest in
   the family business pursuant to statute (§ 46b-81 (c)).

3. The trial court abused its discretion in assigning to the plaintiff the entire
   outstanding debt on the parties' home equity line of credit; the court
   found that the defendant borrowed $10,000 under this line of credit to
   pay his attorney's fees in the dissolution proceeding, thus, its order
   assigning the plaintiff to pay the entire outstanding debt was irreconcil-
   able with its order that the parties were solely responsible for the
   payment of their respective attorney's fees.

Argued October 7, 2021—officially released February 1, 2022

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of New Britain and tried to the court, *Caron, J.*; judgment dissolving the marriage and granting certain other relief in accordance with the parties' premarital agreement, from which the plaintiff appealed to this court. *Affirmed in part; reversed in part; further proceedings.*

*Keith Yagaloff*, for the appellant (plaintiff).

*Kevin B. F. Emerson*, for the appellee (defendant).

*Opinion*

CLARK, J. The plaintiff, Halina Ostapowicz, appeals from the judgment of the trial court dissolving her marriage to the defendant, Jerzy Wisniewski. On appeal, the plaintiff claims that the court (1) lacked subject matter jurisdiction to enforce the parties' premarital agreement, (2) erroneously found that certain property constituted the defendant's separate property under the premarital agreement and failed to assign a specific value to that property, and (3) abused its discretion in assigning to her the debt on the parties' home equity line of credit. We agree with the plaintiff's third claim and, therefore, affirm in part and reverse in part the judgment of the trial court.

The following facts, as found by the court, and procedural history are relevant to our resolution of the plaintiff's appeal. The parties were married on August 21, 2006. Prior to their wedding, they both signed a premarital agreement (agreement). The plaintiff commenced the present action for dissolution of the marriage on October 20, 2017, alleging that the marriage had broken down irretrievably. On May 14, 2018, the defendant simultaneously filed an answer in which he alleged that the marriage should be annulled on the basis of fraud, a cross complaint,[1] and a "notice" to which he attached the agreement. The court tried the case on several days between April 16 and July 19, 2019. The parties and the defendant's daughter, Alice Vautour, and his sister, Barbara Szczypinski, testified at trial.

Following the presentation of evidence and submission of posttrial briefs, the court issued a lengthy and comprehensive memorandum of decision on December 30, 2019. The court found that the plaintiff was fifty-two years old, in good health, and the mother of two adult children. She was born in Poland and came to the United States in 2004 on a tourist visa, but later secured a student visa and attended Central Connecticut State University. When she arrived in the United States, she worked as a private duty nurse. At the time of trial, she was working as a certified nurse's aide at the University of Connecticut Health Center. The plaintiff attained permanent resident status when she married the defendant; she became a United States citizen in 2014.

The defendant was seventy years old and in poor health. He, too, had been born in Poland and came to the United States with his parents when he was fourteen years old. He earned a bachelor's degree in mechanical engineering in 1974. He and his brother owned a machine shop that they sold in 1987. He later was employed by two other businesses. In 2013 and 2014, the defendant had quadruple bypass surgery and two venous thrombectomies. He has difficulty walking and takes a dozen medications daily for his multiple health

problems.

The court also found that, beginning fifty years ago with his parents, continuing with his brother and sister, and now with his children, the defendant and his family have pooled their money, resources, and labor to buy, maintain, and sell investment real estate. At one time, the family owned and maintained twelve investment properties. To further their business, the family has held various bank and investment accounts, each in the name of more than one member of the family. The court found that the family business is an informal venture, and through the generations, there have never been any contracts or written agreements between family members. Names were added to and removed from titles on properties as needed to further the growth of the business. Family members pool their money, putting in and taking out what is necessary, and working together to purchase, renovate, maintain, and sell properties. The court made detailed findings with respect to the family's business assets, both real property and monetary, and related transactions.

The court did not find it surprising that there were no contracts or written agreements between and among members of the defendant's family, stating: "The first generation of immigrants from Poland worked hard and invested well and passed down to their children assets they had accumulated as a family. The next generation, immigrants themselves, continued in the same vein, following the example of their parents, investing money, time and labor as a family. The court does not ascribe any nefarious motives to the informal way the family has conducted its business, nor does it question the fact that there are no written agreements or contracts."

With respect to the parties' relationship, the court found that they had lived together for eleven months in the defendant's Fenwick Street apartment in Hartford before they married. The defendant helped the plaintiff obtain a student visa and eventually permanent residency. He also helped the plaintiff's daughter and son-in-law attain legal status. The court found that the parties had approximately nine years of a good marriage. In November, 2015, the defendant asked the plaintiff, for probate purposes, to sign an addendum to the agreement so that there would be contemporaneous documentation that the plaintiff would not make any claim against any of the properties or accounts the defendant acquired through his family business prior to or since the date of marriage. The court found the timing of the defendant's request significant, as it occurred shortly after he experienced serious health issues. The plaintiff refused to sign the addendum. Multiple events between 2015 and 2017 put a strain on the parties' relationship, including the defendant's health issues and the death of the plaintiff's mother in Poland. The court found that disagreements and arguments over money and real

estate ultimately led the plaintiff to file for divorce.

The court determined that neither party was primarily responsible for the end of the relationship. The court also concluded that the defendant had failed to prove by clear and convincing evidence that the plaintiff married him solely to attain legal status for herself and her family. The court thus found no fraud on the part of the plaintiff and that the parties' marriage was valid.

With respect to the agreement, the court found that, when the defendant asked the plaintiff to sign the agreement, he made clear that his intention was to protect his interest in the family's business. He testified that he would not have married the plaintiff if she had not signed the agreement. At the time the agreement was drafted, the defendant showed the plaintiff bank and account statements regarding the family business.[2] During the marriage, the statements were mailed to the marital home and, according to the defendant, the plaintiff had full access to and knowledge of the contents of the statements. The plaintiff also accompanied the defendant to the bank on several occasions.

The plaintiff testified that the defendant probably told her that he would not marry her if she did not sign the agreement. According to her, the defendant went through his financial affidavit and told her that most of the money was family money and the Fenwick Street apartment house where they were living was a family house. She acknowledged that the defendant and his family worked hard for their money and kept it together but claimed that the defendant never told her how much of the family money was his.

The defendant helped the plaintiff prepare her financial affidavit and explained the agreement to her in Polish. The plaintiff later met with Jacek I. Smigelski, a Polish-speaking attorney, to review the agreement; the defendant, who had separate counsel, was not present at the meeting. The plaintiff asked Smigelski a few questions about the agreement, which he answered. The defendant signed the agreement on July 5, 2006; the plaintiff signed it on July 7, 2006. The parties were married on August 21, 2006.

The court noted that General Statutes § 46b-36a et seq. governs premarital agreements. Under that act, a premarital contract is not enforceable under the following conditions: it was not signed voluntarily; it is unconscionable; a party was not provided fair and reasonable disclosure of the amount, character and value of property, financial obligations and income of the other party; or a party was not provided a reasonable opportunity to consult with independent counsel before signing it. General Statutes § 46b-36g.

The plaintiff acknowledged that both parties signed the agreement, and she did not claim that it is unconscionable. Instead, she claimed that the defendant did

not tell her that the bank accounts he disclosed were co-owned by family members and that she did not have a meaningful opportunity to review the agreement with counsel.

The court rejected both claims. It noted that, although they were not required by statute to do so, the parties appended financial affidavits to the agreement. The defendant reviewed his financial affidavit with the plaintiff prior to the time she signed the agreement and explained to her that much of the money listed in that financial affidavit belonged to his family and that they had always held those assets together. The plaintiff also testified that, at the time she signed the agreement, she understood that she was giving up any future claim for family money in the event of a dissolution. "Given that background and crediting the defendant's testimony that, at the time of the drafting and prior to the signing of the agreement, he showed the plaintiff all of the bank and account statements regarding his family money and business (which bank accounts contained other family members' names as well as the defendant's)," the court found that the defendant provided the plaintiff with a fair and reasonable disclosure of the amount, character and value of his property.

The court also found that the plaintiff had an opportunity to meet with a Polish speaking attorney to review the agreement approximately one and one-half months before the wedding, which the court considered a reasonable period of time for review. It was the plaintiff's responsibility to ensure that the legal consultation was meaningful to her. The court, therefore, concluded that the agreement was valid and enforceable.

The court then turned to the substance of the agreement. The court noted that, under section A of paragraph IX of agreement, titled "Termination of Marriage," "[n]either party [is entitled to] receive any portion of the separate property of the other . . . and/or replacements of such property." Section B of paragraph IX further provides that the "parties shall have no right against each other by way of claims for . . . *division of property existing of this date . . . or acquire*[*d*] *in the future separately from separate* [*funds*]."[3] (Emphasis altered.) As a result, the court construed the agreement to mean that "neither party shall have a claim against the separate property (the real estate in schedules C and D [of the agreement]) or a claim against the property existing as of the date of the [a]greement/ subsequent marriage (all the assets in schedules A and B), *or of any future real estate or investments that flow from these original assets.*" (Emphasis added.) On the basis of the court's construction of the agreement and its finding that "family business assets listed on the defendant's current financial affidavit [were] a direct result of the premarital assets he was in possession of at the time of the marriage, as they were acquired

after the marriage, separately from separate funds," the court concluded that the plaintiff had no right or claim to the defendant's interest in the family business assets he had listed in his current financial affidavit.

With respect to the marital home, however, the court found that the parties had commingled funds to purchase the home and that the plaintiff had helped to maintain it and assisted with improvements. She also had paid the debt on the home equity line of credit. The court concluded, therefore, that the marital home was marital property in which the plaintiff had a legitimate, legal interest.

In dissolving the marriage on the grounds of an irretrievable breakdown, the court ordered, among other things, that the parties are responsible for their respective health insurance and unreimbursed medical expenses; neither party shall receive alimony; the defendant shall quitclaim the marital home to the plaintiff, who "*shall be solely responsible for payment of the* [*home equity line of credit*]," taxes, insurance, and maintenance; the plaintiff has no interest in the defendant's family business; the parties shall retain their respective bank and retirement accounts and pay their respective debts; the defendant shall retain his rights in the family business; the parties shall retain their respective automobiles; and "[*e*]*ach party shall be solely responsible for payment of their respective attorney's fees incurred during the course of this case.*" (Emphasis added.)

The plaintiff filed a motion to reargue on the grounds that the court had erred in classifying and assigning the property it determined was the defendant's separate property and in ordering the parties to be responsible for their own attorney's fees while also assigning the debt on the home equity line of credit to her. The defendant objected to the motion to reargue, arguing, among other things, that assigning the home equity loan to the plaintiff was not an order that the plaintiff pay the defendant's attorney's fees, but the "[c]ourt's calculation as to the appropriate award to the defendant (value of property less balance of the [line of credit])." The court summarily denied the motion to reargue, and the plaintiff did not move for an articulation. This appeal followed.

I

The plaintiff first claims that the court lacked subject matter jurisdiction to enforce the agreement because the defendant did not comply with the requirements of Practice Book § 25-2A.[4] We disagree.

We begin with the standard of review. "Subject matter jurisdiction involves the authority of the court to adjudicate the type of controversy presented by the action before it." (Internal quotation marks omitted.) *Aley* v. *Aley*, 97 Conn. App. 850, 854, 908 A.2d 8 (2006). Subject

matter jurisdiction "may be raised by a party, or by the court sua sponte, at any stage of the proceedings, including on appeal." (Internal quotation marks omitted.) Id. A determination of a court's subject matter jurisdiction is a question of law, and, therefore, our review is plenary. See, e.g., *Giulietti* v. *Giulietti*, 65 Conn. App. 813, 846, 784 A.2d 905, cert. denied, 258 Conn. 946, 788 A.2d 95 (2001), and cert. denied, 258 Conn. 947, 788 A.2d 95 (2001), and cert. denied sub nom. *Vernon Village, Inc.* v. *Giulietti*, 258 Conn. 947, 788 A.2d 97 (2001), and cert. denied sub nom. *Giulietti* v. *Vernon Village, Inc.*, 258 Conn. 947, 788 A.2d 96 (2001).

The following procedural facts are relevant to our resolution of this claim. The plaintiff commenced the present action in October, 2017. The complaint contained no allegation regarding the agreement. On May 14, 2018,[5] the defendant simultaneously filed three pleadings: an answer, a cross complaint, and a "notice" to which he attached a copy of the parties' agreement, including schedules. The defendant did not expressly reference or demand enforcement of the agreement in his prayer for relief.

On October 18, 2018, approximately six months after the defendant had filed with the court the notice and agreement and just twelve days before trial was scheduled to commence, the plaintiff filed a motion to preclude the agreement on the grounds that the defendant had failed to comply with Practice Book § 25-2A, which provides that a party seeking to enforce a premarital agreement "shall specifically demand the enforcement of that agreement, including its date, within the party's claim for relief" within sixty days of the return date "unless otherwise permitted by the court." The plaintiff argued that the defendant did not include a demand for enforcement of the agreement within his claim for relief, did not file the agreement itself within sixty days of the November 21, 2017 return date, and did not seek permission from the court to file any such claim for relief after the deadline for doing so had passed. As a result, she argued that the agreement was not properly before the court and could not be enforced, citing *Warren* v. *Gardel*, Superior Court, judicial district of Fairfield, Docket No. FA-15-6048865-S (November 28, 2016), and *Olderman* v. *Olderman*, Superior Court, judicial district of New Britain, Docket No. FA-14-4034221-S (August 13, 2014).[6]

On the following day, October 19, 2018, the court heard and denied the plaintiff's motion to preclude the agreement. In its order, the court acknowledged that the rules of practice required the defendant to file with his answer and cross complaint a demand for enforcement of the agreement on or before January 21, 2018. The court noted, however, that Practice Book § 25-2A (a) permits "the court to exercise its discretion" with

respect to the time to demand enforcement of an agreement. The court also found that the defendant's filing of the "notice" and agreement "constitute[d] a demand for the enforcement of [the] agreement." The court further found that the plaintiff did not file a timely reply pursuant to Practice Book § 25-2A (b) but, instead, waited until the eve of trial to file her motion to preclude the agreement. As a result, the court denied the motion to preclude but continued the trial in order to provide the parties with more time to conduct discovery regarding the agreement.[7]

On appeal, the plaintiff claims that the court lacked subject matter jurisdiction to enforce the agreement because the defendant did not comply with the specific pleading requirements of Practice Book § 25-2A. As a result, she argues that any orders flowing from the agreement are void. We disagree.

Pursuant to General Statutes § 46b-1, the Superior Court has broad jurisdiction over family matters involving dissolution of marriage, including prenuptial agreements.[8] "Jurisdiction of the [subject matter] is the power [of the court] to hear and determine cases of the general class to which the proceedings in question belong. . . . A court has subject matter jurisdiction if it has the authority to adjudicate a particular type of legal controversy. . . . It is a familiar principle that a court which exercises a limited and statutory jurisdiction is without jurisdiction to act unless it does so under the precise circumstances and in the manner particularly prescribed by the enabling legislation." (Internal quotation marks omitted.) *Muller* v. *Muller*, 43 Conn. App. 327, 331, 682 A.2d 1089 (1996). Under § 46b-1, there is no question that the court had jurisdiction over the dissolution of the parties' marriage, including whether the agreement should be enforced. See *Amodio* v. *Amodio*, 247 Conn. 724, 729, 724 A.2d 1084 (1999) (Superior Court as general jurisdiction tribunal has plenary and general subject matter jurisdiction over legal disputes in family matters). Moreover, it is well settled that the rules of practice, including those pertaining to pleading requirements, do not implicate a court's subject matter jurisdiction. See General Statutes § 51-14 (a) ("[s]uch rules shall not abridge, enlarge or modify any substantive right or the jurisdiction of any of the courts").

Accordingly, the plaintiff's claim that the court lacked subject matter jurisdiction to enforce the agreement fails.[9]

## II

The plaintiff's second claim is that there was insufficient evidence for the court to find that, at the time of the dissolution, certain properties constituted the defendant's "separate property" under the agreement. See footnote 3 of this opinion. The plaintiff argues that the defendant failed to provide sufficient evidence for

the court to trace the properties he owned at the time of trial to the separate properties he owned at the time the parties signed the agreement and were married. She also claims that the court erred by failing to assign a specific value to the defendant's ownership interest in the family business. We disagree.

We begin with the applicable standard of review. "[I]n domestic relations cases . . . this court will not disturb trial court orders unless the trial court has abused its legal discretion or its findings have no reasonable basis in the facts. . . . As has often been explained, the foundation for this standard is that the trial court is in a clearly advantageous position to assess the personal factors significant to a domestic relations case . . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . Notwithstanding the great deference accorded the trial court in dissolution proceedings, a trial court's ruling . . . may be reversed if, in the exercise of its discretion, the trial court applies the wrong standard of law." (Citations omitted; internal quotation marks omitted.) *Maturo* v. *Maturo*, 296 Conn. 80, 87–88, 995 A.2d 1 (2010). "When a trial court has evidence in a dissolution action sufficient for its decision, garnered from the testimony, exhibits and financial affidavits, its rulings will not be disturbed even though the memorandum of decision is silent as to that evidence." *Russo* v. *Russo*, 1 Conn. App. 604, 606–607, 474 A.2d 473 (1984).

In its memorandum of decision, the court quoted in relevant part the following provision of the agreement: "Neither party shall receive any portion of the separate property of the other . . . and/or replacements of such property. . . . The parties shall have no right against each other by way of . . . *division of property existing* [*as*] *of this date* . . . or acquire[d] in the future separately from separate [funds]." (Emphasis added.) The court found that the "family business assets listed on the defendant's current financial affidavit [were] a direct result of the premarital assets he was in possession of at the time of the marriage, as they were acquired after the marriage, separately from separate funds." As a result, the court concluded that, under the agreement, the plaintiff had no right or interest in any of those family business assets.

At trial, the defendant introduced evidence of the premarital family business assets that he owned on the date the parties married, including the agreement with the attached schedules setting forth each parties' assets at the time of the marriage and the value thereof. The defendant's daughter and sister also testified about the family business and how it operated during the parties' marriage, including the family's acquisition of numerous investment properties during that time frame.

The plaintiff argues that the court was required to trace more precisely the defendant's current assets back to the separate property he owned at the time the parties married. She points to paragraph C of section III of the agreement, titled "Separate Property," which provides that the "parties shall keep adequate records of their transactions in such separate property and shall make such records available to the other from time to time, the intent being that at all times the separate property will be effectively updated by each of them in such financial records." She also argues that the agreement, in effect, required the court to sit as a "community property state" and not as an "equitable distribution state" and that courts in community property jurisdictions have held that a party seeking to claim assets as separate property "bears a heightened burden of proof to trace any allegedly converted assets to premarital assets."

In making this claim, however, the plaintiff ignores the court's findings that (1) the defendant complied with the agreement's record keeping provision during the course of the marriage and (2) upon commencing these divorce proceedings and without the defendant's consent, the plaintiff removed from the marital home several boxes of documents containing the defendant's financial records and information on the defendant's computer. According to the court, the plaintiff's failure to produce this information during discovery made it "difficult and at times impossible for the defendant to trace in detail and with specificity all of the family business accounts and premarital assets transactions from the date of the marriage to the present." The plaintiff has not challenged these findings on appeal.

As noted earlier in this opinion, the court heard and credited the testimony of witnesses who described the family business as an informal venture. Family members pooled their money, working together to purchase, renovate, maintain, and sell properties. The court did not find it surprising that there were no contracts or written agreements between and among members of the defendant's family and did not ascribe any nefarious motives to the informal way the family conducted its business. The court made detailed findings concerning the value of the family business assets at the time of the parties' marriage and at trial. It also found that five separate properties in which the defendant had an interest were acquired by the family business during the course of the marriage. With the exception of one such property,[10] the court found that the plaintiff did not contribute any funds toward the purchase of those properties or contribute money or labor toward the renovation, maintenance or upkeep of the properties. The court stated that its findings were based on the evidence and testimony presented at trial and on its observations and assessments of the credibility of the

witnesses. "[I]t is within the province of the trial court, when sitting as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence." (Internal quotation marks omitted.) *Zilkha* v. *Zilkha*, 167 Conn. App. 480, 487–88, 144 A.3d 447 (2016).

On the basis of our review of the entire record, we conclude that, under the circumstances of this case, there was sufficient evidence to support the trial court's findings with respect to the defendant's separate property. We reach that conclusion in part because the court determined that the plaintiff's removal and failure to produce the defendant's financial records prevented him from performing the kind of detailed tracing the plaintiff claims was required. See *Certo* v. *Fink*, 140 Conn. App. 740, 743, 749–50, 60 A.3d 372 (2013) (court did not commit error in relying on plaintiffs' estimate of damages when court credited plaintiffs, discredited defendant, and found that plaintiffs had to rely on estimate of damages as result of defendant's failure to provide discovery).

We also reject the plaintiff's claim that the court improperly failed to place a total value on the defendant's interest in the family business, in violation of General Statutes § 46b-81 (c). That statute concerns the court's authority to assign to either spouse all or part of the estate of the other spouse. In this case, the court determined that the defendant's interest in the family business constituted his separate property under the agreement and, in accordance with the agreement, ordered that, upon dissolution, the defendant shall retain his interest in that separate property. Thus, § 46b-81 (c) had no applicability because the court did not assign to either party the other party's interest in the family business. Accordingly, the plaintiff's claim that the court improperly classified and assigned the defendant's separate property interest in the family business fails.

### III

The plaintiff's third and final claim is that the court abused its discretion in assigning to her the entire outstanding debt on the parties' home equity line of credit. We agree because that order conflicts with the court's order regarding attorney's fees.

"The construction of a judgment is a question of law for the court. . . . As a general rule, judgments are to be construed in the same fashion as other written instruments. . . . The determinative factor is the intention of the court as gathered from all parts of the judgment. . . . The interpretation of a judgment may involve the circumstances surrounding the making of the judgment. . . . Effect must be given to that which is clearly implied as well as to that which is expressed. . . . The judgment should admit of a consistent con-

struction as a whole." (Citations omitted; internal quotation marks omitted.) *Lashgari* v. *Lashgari*, 197 Conn. 189, 196–97, 496 A.2d 491 (1985).

"Our standard of review for financial orders in a dissolution action is clear. The trial court has broad discretion in fashioning its financial orders, and [j]udicial review of a trial court's exercise of [this] broad discretion . . . is limited to the question of whether the . . . court correctly applied the law and could reasonably have concluded as it did." (Internal quotation marks omitted.) *Hammel* v. *Hammel*, 158 Conn. App. 827, 835–36, 120 A.3d 1259 (2015). "This deferential standard of review is not, however, without limits. There are rare cases in which the trial court's financial orders warrant reversal because they are, for example, logically inconsistent . . . or simply mistaken . . . ." (Internal quotation marks omitted.) Id., 836.

The following additional facts are relevant to this claim. In December, 2015, the parties obtained a home equity line of credit and used some of the funds to pay off the plaintiff's personal line of credit, totaling $24,271. The parties also drew on the line of credit for their respective attorney's fees in this dissolution matter. The court specifically found that the defendant borrowed $10,000 under this line of credit to pay his own attorney's fees in this matter but also ordered, among other things, that the "plaintiff shall be solely responsible for payment of the [home equity line of credit],"[11] and that "[e]ach party shall be solely responsible for payment of their respective attorney's fees incurred during the course of this case."

On appeal, the plaintiff argues that the court's order regarding the home equity line of credit conflicts with its order that the parties are responsible for the payment of their respective attorney's fees. We agree that the two orders are irreconcilable. We, therefore, reverse the judgment only with regard to the order that the plaintiff is solely responsible for the debt on the home equity line of credit and remand the case with direction to resolve the inconsistency.[12]

The judgment is reversed only as to the order regarding the home equity line of credit and the case is remanded for further proceedings consistent with this opinion; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] The cross complaint alleged that the marriage should be annulled on the grounds of fraud and misrepresentation because the plaintiff allegedly entered the marriage with the sole intent of using the defendant's citizenship to gain permanent residency and citizenship for herself, her children and her son-in-law.

[2] Four schedules, which listed the parties' respective assets and liabilities, were attached to the agreement.

[3] Section III of the agreement, titled "SEPARATE PROPERTY," provides as follows: "Each of the parties agrees that the property described hereafter, shall be defined as the separate [property] of the other party.

"A. All property of [the defendant] listed on 'Schedule C' attached hereto and all property listed of [the plaintiff] listed on 'Schedule D' attached hereto.

"B. All property, whether real or personal or whatsoever nature and wheresoever situated acquired by either party out of the proceeds or income from the separate property or any replacements thereof, or attributable to appreciation in value of said property, or their replacements, whether the enhancement is due to market conditions or to the services, skills or efforts of either of the parties.

"C. The parties shall keep adequate records of their transactions in such separate property and shall make such records available to the other from time to time, the intent being that at all times the separate property will be effectively updated by each of them in such financial records."

Schedules A and B are the parties' respective financial affidavits that were appended to the agreement. Schedules C and D document the title holders of the real estate that was listed in the parties' respective financial affidavits.

[4] Practice Book § 25-2A provides in relevant part: "(a) If a party seeks enforcement of a premarital agreement . . . he or she shall specifically demand the enforcement of that agreement, including its date, within the party's claim for relief. The defendant shall file said claim for relief within sixty days of the return date unless otherwise permitted by the court.

"(b) If a party seeks to avoid the premarital agreement . . . he or she shall, within sixty days of the claim seeking enforcement of the agreement, unless otherwise permitted by the court, file a reply specifically demanding avoidance of the agreement and stating the grounds thereof."

[5] In its order denying the plaintiff's motion to preclude the agreement, the court cites different dates on which the answer, cross complaint, and notice were filed. Those dates appear to be the dates the documents were signed or captioned, however. According to the docket prepared by the clerk, all three documents were filed on May 14, 2018.

[6] In *Warren*, the court noted that Practice Book § 25-2A "requires that a party seeking to enforce a pre- or post-nuptial agreement plead the agreement in the prayer for relief." *Warren* v. *Gardel*, supra, Superior Court, Docket No. FA-15-6048865-S. Because neither party had done so, the court concluded that it did "not have the authority to issue orders enforcing the terms of the pre-nuptial agreement itself." Id. Similarly, in *Olderman*, neither party had pleaded or demanded enforcement of the premarital agreement in accordance with Practice Book § 25-2A. The court concluded, without discussion or analysis, that, "[c]onsequently, a claim for enforcement of the premarital agreement is not properly before this court." *Olderman* v. *Olderman*, supra, Superior Court, Docket No. FA-14-4034221-S. Neither court suggested that a party's failure to comply with Practice Book § 25-2A deprived the court of *subject matter jurisdiction* over the agreement, which is the plaintiff's claim in the present appeal.

[7] The trial was rescheduled for April 16, 2019.

[8] General Statutes § 46b-1 provides in relevant part: "Matters within the jurisdiction of the Superior Court deemed to be family relations matters shall be matters affecting or involving: (1) Dissolution of marriage, contested and uncontested . . . (15) actions related to prenuptial . . . agreements . . . ."

[9] The plaintiff's claim on appeal is that the defendant's failure to comply with the pleading requirements of Practice Book § 25-2A deprived the court of subject matter jurisdiction to enforce the agreement. The only hint of an alternative, nonjurisdictional claim challenging the court's *authority* to enforce the agreement appears in the following sentence of her reply brief: "Since [the] [d]efendant never pleaded the agreement, the trial court was without [subject matter] jurisdiction to hear it, or, *in the alternative*, could not enforce it." (Emphasis added.) Because the plaintiff did not make such a claim in her principal brief, we need not decide the separate question of whether the pleading requirements of § 25-2A are mandatory, as opposed to directory, and whether the defendant's alleged failure to comply strictly with those provisions deprived the court of the *authority*, as opposed to the jurisdiction, to enforce the premarital agreement. See, e.g., *Calcano* v. *Calcano*, 257 Conn. 230, 244, 777 A.2d 633 (2001) (arguments cannot be raised for first time in reply brief).

[10] With respect to the Fenwick Street property in Hartford, the court found that the plaintiff paid utilities and contributed toward the rent from the time the building was sold out of the family's business in 2014 until the parties moved to the marital home in December, 2015.

[11] The court also ordered that no further funds were to be drawn on the home equity line of credit.

[12] During oral argument before this court, counsel for the parties agreed that the order regarding payment of the home equity line of credit was

severable from the mosaic of the court's financial orders. We agree. See *Tuckman* v. *Tuckman*, 308 Conn. 194, 214, 61 A.3d 449 (2013) (financial order severable when not interdependent with other orders).

—————————————————————